**Joann ANGEL, Administratrix of the Estate of Jerry Angel, Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

Nos. 84–3343, 3609.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1985.

Decided Oct. 16, 1985.

A.P. Anninos, argued, Cincinnati, Ohio, for plaintiff-appellant.

Robert Behlen, John J. Cruze, argued, Elizabeth Gere Whitaker, Michael D. Eagen, Cincinnati, Ohio, for defendant-appellee.

Before KENNEDY and KRUPANSKY, Circuit Judges, and DOWD,* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

This is an appeal from a judgment in favor of the United States[1] on a claim filed under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80. Ohio law is applicable. We vacate and remand to the District Court for further findings.

## I.

Plaintiff's decedent was killed while sandblasting a building in the Defense Electronics Supply Center (DESC), Dayton, Ohio, when an aluminum ladder he was moving made electrical contact with an uninsulated high voltage wire. DESC is owned and operated by the United States. The decedent was co-owner of Riteway Waterproofing Company (Riteway). DESC entered into a contract through the Small Business Administration with White Brothers Construction Company (White) to sandblast and paint DESC buildings. White subcontracted the sandblasting to Jatag Waterproofing Company, which subcontracted the work to Riteway.[2]

Building 26, the building being sandblasted when the fatal accident occurred, was a pitched roof building with walls nine feet in height and an apex at its north and south ends of fifteen feet. Approximately ten feet from the north side of the building was a platform suspended between two poles set parallel to the building, on which there were three transformers. Above the transformers, arms were set on the poles perpendicular to the line of the side of the building and the platform. Running between the ends of these arms, seven feet

---

* The Honorable David D. Dowd, Jr., United States District Court for the Northern District of Ohio, sitting by designation.

1. Plaintiff initially brought her claim against the Dayton Power and Light Company (Dayton) and White Brothers Construction Company (White) as well. Dayton was dismissed by consent during the course of discovery once it was established that the transformer installation was in the exclusive possession and control of DESC. White was dismissed upon settlement of plaintiff's claim against it, but participated in the trial since a third-party claim for indemnification was asserted against it by the United States. The District Court held that its determination of the case relieved White of any responsibility to the United States.

2. In ¶ 2 of its findings of fact, the District Court found that White subcontracted the sandblasting to Riteway, and cites "Def. United States' Ex. B." However, it is undisputed in the record that White subcontracted the work to Jatag, in the person of James King, who in turn subcontracted the work to Riteway. The exhibit referred to is the contract between SBA/DESC and White. The record does not contain the White-Jatag contract. (King testified in his deposition (which was admitted in evidence) that he was unable to locate that contract, was unsure whether he ever actually signed it, and that he did not believe that it was more than a couple of pages or that it incorporated any of the safety provisions referenced in the prime contract. King Dep. at 17–23.) Plaintiff's Exhibit 43 is a one-page offer sheet/contract under Riteway's letterhead to "Jim King," offering "To sandblast Buildings # (–26–20–10–18–30) at DESA [sic] Plant. In Dayton, Ohio" for $38,000, submitted under decedent's signature and accepted, presumably by King, although the signature is illegible.

from the building and nineteen and one-half feet above the ground, was the uninsulated wire, carrying 12,000 volts of electricity. Numerous other wires, which were insulated and not dangerous, ran from the transformer installation to the building, between the poles above the transformers, and outward from the installation to lines supplying power to the rest of the DESC compound. In ¶ 6 of its findings of fact, the District Court found that a sign was affixed to one of the poles at a height of ten to twelve feet containing the words " 'Danger: High Voltage.' "

On Friday, November 2, 1979, the decedent, his employee James Knopf, and James King of Jatag, began sandblasting the building. They completed all but a small portion of the north side of the building, using a wooden stepladder to do the nine-foot sides, and a twenty-foot aluminum ladder for the peaked center. At the end of the day on Friday, the aluminum ladder was left standing against the north side of the building.[3] Decedent, Knopf and King returned to the site the next morning. While shifting the position of the ladder preparatory to resuming work, the decedent was electrocuted when he either touched the high voltage wire with the ladder, or came sufficiently close to the wire for current to "arc" to the ladder.

The contract between White and DESC delegated responsibility for safety on the job site to White, and incorporated "all requirements of the Occupational Safety and Health Act" (Technical Provisions SI–1–5) and specifically enumerated provisions of the Armed Services Procurement Regulations (ASPR), including ASPR ¶¶ 7–602.-42(a) & 7–602.43. In ¶ 5 of its findings of fact, the District Court found that "[t]he contract (see Def's. Ex B) required compli-

ance with certain regulations of [OSHA]," including 29 C.F.R. §§ 1926.450(a)(11) & 1926.400(c)(1). The court's opinion does not specifically identify "Def's. Ex. B" as the SBA/DESC-White contract, or state whether Angel or Riteway were parties to this contract or aware of these provisions. Appellant asserts, and it is not disputed by the government,[4] that these provisions were not referenced in the subcontracts, nor were subcontractors present at a preconstruction meeting with White and government representatives at which safety and the applicability of OSHA regulations and other safety provisions were discussed.

Carl Gibson, an engineering technician employed at DESC, testified that he attended the preconstruction meeting and visited the Building 26 work site at least twice before the fatal accident, on Friday and Saturday morning. Although he testified that he did not remember whether he noticed ladders on the site on either occasion, his deposition testimony was introduced in which he had testified that on Friday he had observed the use of aluminum ladders on the work site but had not warned anyone concerning their use. Although Gibson was a quality assurance inspector and not a safety inspector, James Donovan, the DESC contract officer and Gibson's superior, assented in his testimony to the statement that "the person that would do the inspection for the government [pursuant to ASPR ¶ 7–602.43] would be somebody like Mr. Gibson." Tr.-I–27. He also testified, when asked who Gibson would report to if he saw something that violated the safety rules, "If there was a grave violation of anything, such as a man welding that did not have on safety glasses or anything, I'm sure you would point it out to the contractor." Tr. I–33.

---

**3.** Knopf testified that the ladder was left standing overnight, and the District Court so found in ¶ 4 of its findings of fact, although King's deposition contradicted this testimony. King stated that the ladders were stowed on the ground on the other side of the building when work was completed on Friday, and that Angel was carrying the ladder back around to the north side of the building on Saturday morning to resume work when the accident occurred. King Dep. at

**56.** King's deposition was admitted as evidence at the close of trial. The original of the deposition was still sealed when the record was received by this Court. It is unclear whether the District Court was provided with a copy or whether it was not read by the District Court.

**4.** *See* Defendant United States' Proposed Findings of Fact ¶¶ 34–35.

OSHA regulation 29 C.F.R. § 1926.-450(a)(11) provides, in pertinent part: "Portable metal ladders shall not be used for electrical work or where they may contact electrical conductors." 29 C.F.R. § 1926.400(c)(1) provides, as relevant: "No employer shall permit an employee to work in ... proximity to any part of an electrical power circuit ... unless the employee is protected against electrical shock by deenergizing the circuit and grounding it or by guarding it by effective insulation or other means...." These regulations were quoted in ¶ 5 of the District Court's findings of fact, in which the court also found: "It is undisputed that Mr. Angel, as an owner of Riteway Waterproofing Co., was both an employer and an employee insofar as the aforesaid regulations are concerned." OSHA Regulation 29 C.F.R. § 1910.305(5)(E)(ii), not noted in the District Court's opinion but raised by plaintiff's counsel during the trial, states: "The operating voltage of exposed live parts of transformer installations shall be indicated by warning signs or visible markings on the equipment or structure." [5]

ASPR ¶ 7-602.42(a), headed "Accident Prevention," provides, in pertinent part:

(a) In order to provide safety controls for protection to the life and health of employees and other persons ... the Contractor shall comply with all pertinent provisions of Corps of Engineers Manual EM 385-1-1....

. . . .

(c) The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions.... If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken....

(d) Compliance with the provisions of this clause by subcontractors will be the responsibility of the Contractor.

ASPR ¶ 7-602.43, headed "Government Inspectors," provides:

The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract.

In the opinion section of its Findings of Fact, Opinion and Conclusions of Law, the District Court rejected plaintiff's contention

that liability rests upon the United States for failure to warn of a dangerous condition. The condition in question, to wit, an uninsulated electrical wire some 19 and one-half feet above the ground, is not dangerous to the ordinary frequenter of the premises. That condition is conceivably hazardous only to a person who is equipped with a metal object long enough to reach it.

. . . .

Three sides of Building 26 were totally devoid of any electrical connection. Even the north side was free from danger since the electrical wires supplying the building were insulated. Closing the narrow "window" of liability, even assuming plaintiff's position, arguendo would require the stationing of an inspector at all times to insure that a metal ladder otherwise appropriate on the DESC property would not be used in a fashion that would bring it into contact with an electrical wire which was over

---

**5.** The Corps of Engineers Manual, incorporated into the contract by virtue of ASPR ¶ 7-602.-42(a), states in the transmittal letter on its title page ¶ 3.a., that it is consistent with the requirements of OSHA. Included in the manual's provisions are the following:

**10.C.01.** Warning signs shall be placed to provide adequate warning of hazards to workmen and the public....
**15.1.05.** Transformer banks or high voltage equipment shall be protected from unauthorized access.... Signs warning of high voltage and prohibiting unauthorized entrance shall be posted at entrances....

four and one-half feet above the highest point that would require sandblasting. Such a vigil is not required of the United States. *Gowdy [v. United States,* 412 F.2d 525, 531 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969)].

In accordance with the foregoing the Court finds that the plaintiff has not established by a preponderance of the evidence any act of negligence on the part of the United States that would entitle such plaintiff to recovery.

In its conclusion of law, the District Court found:

(C) Where a workman required to sandblast no portion of a building higher than 15 feet one inch elects to utilize a 20 foot aluminum ladder and brings such ladder into contact with an exposed electrical wire 19 and one-half feet above the ground, such workman is negligent and the contact between such ladder and wire is the sole proximate cause of his injury and death.

(D) The United States is not liable for the negligence of its independent contractor. *Gowdy, supra,* at 529.

(E) The use of a metal ladder in a position where it may contact electrical conductors is a violation of 29 CFR 1926.450 and does not impose liability upon the United States. *Id.*

(F) The United States is not an insurer of the safety of an employee of a subcontractor and is not required to monitor constantly a work site where subcontractor equipment is not dangerous under most circumstances and becomes dangerous only when misused by an employee. *Id.* at 531.

6. Plaintiff has argued that the visit of a government inspector to the work site shortly before the accident occurred would supersede any contributory negligence on the part of plaintiff's decedent under the last clear chance doctrine. Regardless of the merits of this argument under prior Ohio law, last clear chance was merged into the doctrine of negligence upon adoption of comparative negligence. *Mitchell v. Ross,* 14 Ohio App.3d 75, 470 N.E.2d 245 (1984).

7. In this as in other questions presented in this case, we are forced to rely upon statements by

## II.

Comparative negligence is the law of Ohio, O.R.C. § 2315.19, and is applicable to the instant claim. *Wilfong v. Batdorf,* 6 Ohio St.3d 100, 451 N.E.2d 1185 (1983) (comparative negligence statute applies retroactively to claims arising before but tried after its passage). Under Ohio law, a party may only recover if its negligence was no greater than the combined negligence of all other persons from whom recovery is sought. O.R.C. § 2315.19(a)(1).[6] The District Court questioned the attorneys during the trial about the comparative negligence statute, Tr. III–19, and, although it does not state so explicitly in its opinion, the court apparently acknowledged the statute's applicability.[7] Read in this light, the effect of the court's opinion is to have found that 100% of the negligence that directly and proximately caused the injury was attributable to plaintiff's decedent and 0% was attributable to the United States.[8]

Plaintiff contends that the District Court misapplied Ohio law in making these findings. As to the negligence of the decedent, she argues that Ohio law regards the hazards of electricity as a latent danger, not open and obvious to the average person. Hence, a determination that an individual failed to exercise due care in working near electrical installations necessitates proof of the individual's actual knowledge of the danger presented. She asserts that the court regarded the danger of the transformer installation as open and obvious, and failed to make factual inquiry into the actual knowledge of the decedent necessary to find that the decedent acted negligently.

the court in the record to supplement the court's opinion. Such statements, "and any implications which might be drawn therefrom, while revealing, are not, of course, binding upon us." *Gunn v. United States,* 283 F.2d 358, 362 (8th Cir.1960) (Blackmun, J.).

8. It was undisputed that the contact between the ladder and the wire caused Mr. Angel's death. We must assume that the court meant to say that Angel's negligence in bringing the ladder in contact with the wire was the sole proximate cause of his death.

As to the negligence of the United States, plaintiff's argument is that under Ohio law, the government had a duty to warn the decedent, as a frequenter or business invitee on its premises, of any dangers reasonably foreseeable under the particular circumstances of which the government was aware. She contends that under the facts as presented her decedent's injury was foreseeable.

### A.

■ The law of Ohio regards the dangers of electrical instrumentalities as latent to the average person. In *Lazar v. Cleveland Elec. Illuminating Co.*, 43 Ohio St.2d 131, 331 N.E.2d 424 (1975), plaintiff, an experienced TV antenna installer, was injured when he came in contact with a high tension wire while installing an antenna on the roof of his home. The court of appeals had held that while the defendant had been negligent in permitting the wire to sag close to plaintiff's roof, plaintiff was contributorily negligent as a matter of law. The Ohio Supreme Court reversed, stating the law of Ohio in the syllabus[9] to be as follows:

> A determination that reasonable minds could not differ as to whether an individual who comes in contact with an uninsulated high tension electric wire while working on a residential roof is contributorily negligent requires evidence which clearly shows that the plaintiff was or should have been conscious of the existence of facts from which a reasonably prudent man would have foreseen the presence of such wires, or, having seen them, have recognized their dangerous propensities.

The *Lazar* court specifically rejected dictum from *Hetrick v. Marion-Reserve Power Co.*, 141 Ohio St. 347, 356, 48 N.E.2d 103 (1943), "that 'the presence of ... suspended wires, in and of themselves, is a warning to the adult public of potential danger.' That language does not express a controlling principle of law." *Lazar*, 43 Ohio St.2d at 139 n. 2, 331 N.E.2d 424. After reviewing the case law of numerous other states holding that the mere presence of power lines does not present an open and obvious danger to the general public,[10] the

9. In Ohio, the syllabus states the governing legal principle of the case. *Cassidy v. Glossip*, 12 Ohio St.2d 17, 231 N.E.2d 64 (1967).

10. The *Lazar* court cites *Stilfield v. Iowa-Illinois Gas & Elec. Co.*, 25 Ill.App.2d 478, 167 N.E.2d 295 (1960); *Henderson v. Kansas Power & Light Co.*, 184 Kan. 691, 339 P.2d 702 (1959); *Groh v. Philadelphia Elec. Co.*, 441 Pa. 345, 271 A.2d 265 (1970); *Burk v. Missouri Power & Light Co.*, 420 S.W.2d 274 (Mo.1967); *Lancaster v. Potomac Edison Co.*, 156 W.Va. 218, 192 S.E.2d 234 (1972); *Mark v. Pacific Gas & Elec. Co.*, 7 Cal.3d 170, 101 Cal.Rptr. 908, 496 P.2d 1276 (1972). *But see Palaidis v. United States*, 564 F.Supp. 1397 (M.D.Fla.1983).

In *Palaidis*, plaintiffs were painting subcontractors injured when their metal scaffold made contact with high voltage wires adjacent to the building they were painting. The facts are remarkably similar to the instant case—the building was located on a government compound, the general contractor's contract incorporated the same ASPR provisions, the Corps of Engineers Manual provided that "[e]xtreme caution shall be taken where metal scaffolds are used in the vicinity of energized electrical circuits," and the scaffold was higher than the wire and higher than was permitted by regulation. The court found that although the subcontractors employees were invitees of the government, toward whom the government "had the duty of using due care in maintaining its premises during the time plaintiffs were painting the exteriors of the 20 base facilities and to warn plaintiffs of hidden dangers known to the owner but not known to plaintiffs," 564 F.Supp. at 1400, the government had not breached such a duty, since "[t]he existence of the uninsulated overhead power line would have been clearly visible to plaintiffs if they had been exercising reasonable care for their own safety and had looked up. Defendant breached no duty of care in failing to give plaintiffs warning of the location of the power line." *Id.* The court concluded that "[t]he failure of plaintiffs to exercise reasonable care for their safety was the sole proximate cause of the accident." *Id.* at 1401.

Thus, the facts, reasoning and result of *Palaidis* are remarkably similar to those in the instant case. There are, however, two fundamental differences between the cases. First, under Florida law "it is presumed that the inherent dangers of electrically energized wires is [sic] known to all except those of tenderest age.'" *Id.* at 1401 (quoting *Somers v. Meyers*, 171 So.2d 598, 601 (Fla.Dist.Ct.App.1965)). Second, in *Palaidis*, on two prior occasions, government inspectors had observed plaintiffs working in close proximity to electrical installations without proper safety precautions and warned them

court observed "that reasonably prudent men are marginally able, at best, to distinguish between those overhead wires which are dangerous, and those which are not. This fundamental truth was demonstrated anew in the present case," 43 Ohio St.2d at 141, and "[r]easonable men have the vague notion that some power lines are dangerous. They probably know little more." *Id.* at 143.

Throughout the record of this case, the District Court repeatedly indicated that, whether or not it would be clear to the average observer that the particular wire with which the decedent made contact was a live uninsulated high voltage wire, it believed that anyone would recognize that the transformer installation as a whole was dangerous. At the close of the pretrial hearing on the government's motion for partial summary judgment, the following exchange took place between the court and counsel:

> THE COURT: Mr. Anninos, I don't believe anybody can argue in this day and age that electricity or electric lines are a latent defect. They're there, they're apparent and they are potentially—you know, it's common knowledge, is it not, that electricity will kill you if used by the State for that purpose?
>
> MR. ANNINOS: Not in Ohio law, Your Honor. The Lazer case is very, very clear on that point. [R. 14]

The court made a similar observation during trial, and seemed to indicate by its statement that it regarded the actual knowledge of the decedent as irrelevant to the question of his own negligence, although the court could also be interpreted as ruling merely that decedent's knowledge was irrelevant to whether the government had a duty to warn:

> Q. Did you tell the people that they should be careful of that line?
>
> THE COURT: I think we are getting a bit afield, Mr. Anninos? There is no

establishing to this point any foundation for that question or those questions.

> The decedent here was an experienced sand blaster. This was not the first job he had ever been on. And he elects to use a metal ladder in his own business with a transformer in full view.
>
> Are you asserting that there was a duty on the United States or anyone else to warn him, "That is a transformer. You had better be careful"?
>
> Is that what you are saying?
>
> MR. ANNINOS: Yes, Your Honor, because that is 12,000 volts, and 12,000 volts will kill you instantly.
>
> THE COURT: As a matter of fact, substantially less than that will too. And anyone looking at it would know that it is a transformer.
>
> We aren't dealing with a child.
>
> MR. ANNINOS: You are assuming facts, Your Honor.
>
> THE COURT: .... All right, we will assume that the decedent didn't know that was a transformer.... He didn't know what that was.
>
> MR. ANNINOS: Right.
>
> THE COURT: The question is still irrelevant. Would you proceed to your next question. [Tr. II–30–31]

■ The opinion of the District Court states as a *conclusion of law* that a workman using a twenty-foot aluminum ladder to sandblast a fifteen-foot building and making contact with an exposed electrical wire nineteen and one-half feet above the ground is negligent and the contact is the sole proximate cause of his injury. This does not seem to us to be a correct statement of Ohio law. That is not to say that there is not evidence in the record from which the court could have concluded as a matter of *fact* that decedent knew or should have known that the transformer installation was dangerous.[11] *Cf. Parsons*

of the danger of doing so. In the instant case, Ohio law does not impute knowledge of the dangerousness of electricity, and there was no prior warning.

11. There is evidence in the record on which such a finding could be based. For example, King testified in his deposition as follows:

*v. Blount Brothers Construction Co.*, 281 F.2d 414 (6th Cir.1960).[12] We simply can-

not determine whether the District Court made such a finding,[13] and hence must

Q. On your first visit to the site do you recall observing the presence of power lines in and about the buildings you were going to be working on?

A. I'm going to say yes, because we always do. I mean, you think about that as part of what you do.

Q. And you think about it as part of what you do because that's one of the hazards that you've got to be sure to stay clear of?

A. That's one of the hazards we deal with all the time, right.

Q. Power lines?

A. Power lines, roof heights and those kinds of things. That's the kind of thing we deal with.

....

Q. Based on your knowledge of Mr. Angel's job performance prior to this job when the accident happened, what did you know about him as far as being safety conscious?

A. While working for me I have not known him to take undue chances. I mean, the nature of the business itself is risk, but I have not known him to take undue risk.

Q. Did you know from your experience that he was knowledgeable of the risks involved in this business?

A. Yes.

Q. Did you know him to be aware in particular of the risks of power lines that may be in the vicinity of work sites?

A. I guess we never talked about it as an item within itself, but I'm sure he's aware of the danger of power lines.

....

Q. On those prior occasions did you observe him working with ladders in the vicinity of electrical wires?

A. All the occasions, no. Some occasions there were electric wires around.

Q. In the standblasting work that you're familiar with are the electrical wires a common hazard that you have to be careful of?

A. Yes.

....

Q. On that particular occasion when Jerry was with you at the time you reviewed the job site before starting the job were these wires and these power installations or power units, I should say, present?

A. Yes.

Q. Did you observe them at that point in time?

A. Yes.

Q. Did you have any difficulty ascertaining that those power lines were present by building 26?

A. No.

Q. Is it fair to say that those power lines and that installation of a power unit is apparent?

A. Yes.

MR. ANNINOS: I'll Object.

[King Dep. at 28–29, 30–31, 83–84, 85–86] William Slusher, decedent's partner in Riteway, also testified as follows:

Q. So, the practice of your company back in 1979 was that if you identified an electrical hazard that may interfere with your work, you would take action to either avoid it or have it protected; is that a fair statement?

A. Yes, that is usually left up to the owner because the owner knows the building, you know, and he knows the details about the dangers on the job.

Q. But, sir, you know your work as a sandblaster.

A. Right.

Q. And you have been in situations where there are bare wires that may get in the way of where you work. And if that is the situation, you take action to protect yourselves; am I right in saying that?

A. Yeah, we would notify the owner. Yes. [Tr. II–139]

On the other hand, decedent's employee Knopf's testimony suggests that decedent did not recognize the dangerousness of the installation:

Q. Before going up the ladder to sand blast on the north side of the building, did you have a discussion with Jerry regarding electricity?

A. He told me not to sand blast next to the wires because he didn't want to damage the wires going into the building.

And I asked him if there was electricity supposed to be going into the building, and he told me that there wasn't, to his knowledge. That is what he told me.

....

Q. Other than what you have testified about to damaging the wires, did he tell you anything else about electricity?

A. No, sir. [Tr. II–116]

12. In *Parsons*, plaintiff brought a wrongful death action based upon the failure of defendant's safety engineer to warn her decedent of the danger of suspended high voltage wires, which electrocuted decedent when the boom of a crane touched the wires while decedent was guiding a piece of pipe attached to the crane. In reversing judgment in favor of the defendant, Judge Weick, writing for the Court, made the following observations on the evidence with regard to the issue of contributory negligence:

There was no evidence that decedent knew the exact height of the wires or the boom.... There was a sign near the transformer station reading: 'High Voltage—Keep out.' There were no warning signs near the piles of pipe where decedent was working. There were numerous other wires in and about the

remand for further findings on the issue of decedent's negligence, consistent with Ohio law.

## B.

■ The second question that we must address is whether the District Court correctly applied Ohio law with respect to negligence on the part of the government as owner of high voltage wires. While the District Court was correct that the government is not an insurer and is not liable for the negligence of its independent contractor, it is liable for its own negligence. *See Thomas v. Tennessee Valley Authority*, 769 F.2d 367, 370 (6th Cir.1985). In the instant case, the government may only be found negligent if it had a duty to warn the decedent of the danger of the high voltage wire and failed to carry out that duty.

In holding that plaintiff failed to establish any negligence on the part of the government, the District Court relied upon *Gowdy v. United States*, 412 F.2d 525 (6th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 756 (1969). Throughout the record of this case, the court repeatedly challenged plaintiff's counsel to explain why the *Gowdy* case was not dispositive of plaintiff's claim. In *Gowdy*, a workman who fell from the roof of a lighthouse brought an FTCA claim against the United States on the theory that it had been negligent in not maintaining a guardrail around the roof. The Court held that "[t]he mere reservation of the right to inspect the work did not impose upon the Government any duty of inspection or control," 412 F.2d at

529, that "the Government was not required to warn Gowdy of something which he admitted that he already new [sic], namely, that no guardrail was on the flat roof and that it was dangerous for him to work too close to the edge of the roof because he might lose his balance and fall," *id.* at 535, and "that the Government ... could not have anticipated that a reasonably careful workman would not protect himself from the known and obvious dangers here involved." *Id.*

We agree with the appellant that *Gowdy* is distinguishable from the instant case in several critical respects. First, as noted previously, under Ohio law, the dangers of electricity are latent, while the danger in *Gowdy*—falling off a roof—was open and obvious. Moreover, the plaintiff in *Gowdy* conceded that he recognized that danger.

■ Second, under Ohio law, in determining whether the owner of a premises owes a duty to provide an independent contractor with a reasonably safe place in which to work, "the determinative issue is whether the defendant had custody and control of the premises." *Parsons v. Blount Brothers Construction Co.*, 281 F.2d at 416. While the transformer platform was adjacent to Building 26, no work was to be performed on the platform and the government *conceded* during trial that the United States maintained custody and control over the transformer platform while work was progressing on Building 26. Tr. II–18.

Third, while the holding that a reservation of a right to inspect does not impose any duty of inspection or control may be correct as stated or under Michigan law, which was applicable in *Gowdy*, it does not

---

construction area. The proof did not disclose whether decedent knew that the wires in question were high-tension wires.

**13.** Nor do we believe that the District Court could have presumed such knowledge as a matter of fact based upon the nature of decedent's occupation and experience. In *Lazar*, the court noted that "the man with special skill and training, the one who both recognizes *and appreciates* the danger presented by an uninsulated electrical wire, will be held to a higher standard

of care than his less well-educated counterpart. But that skilled technician is not this plaintiff...." 43 Ohio St.2d at 144, 331 N.E.2d 424 (emphasis in original). Given the fact that the plaintiff in *Lazar* was an experienced installer of TV antennas, an occupation that presumably would frequently entail work in the vicinity of suspended wires, and the thrust of the court's reasoning overall, it is apparent that by "special skill or training" and "skilled technician," the court referred to an electrician, lineman, or one with similar knowledge or experience.

necessarily relieve the government of a duty to warn under Ohio law on the facts in the instant case. In *Walker v. Mid-States Terminal, Inc.*, 17 Ohio App.3d 19, 477 N.E.2d 1160 (1984), the law of Ohio is stated in ¶ 1 of the syllabus as follows:

> The determination as to whether the owner of property may be held liable, pursuant to the Ohio "frequenter" statutes (R.C. 4104.01 *et seq.*), for injuries sustained by employees of an independent contractor presents a jury question and turns upon a finding of the retention of the right to possession and control of the premises and is not limited to a finding of actual exercise of such rights (*Hirschbach v. Cincinnati Gas & Elec. Co.* [1983], 6 Ohio St.3d 206, 452 N.E.2d 326, applied.) [emphasis added]

In *Walker*, plaintiffs were the employees of an independent contractor engaged in construction work on defendant's premises, who suffered injury as the result of their misuse of their own equipment. The authority reserved to the owner in the relevant contractual provisions[14] does not differ materially from that reserved to the United States in the instant case by ASPR ¶¶ 7–602.42(c) & 7–602.43—the right to inspect, require compliance by the contractor with necessary safety measures, and halt work if such compliance is not forthcoming. Moreover, the court in *Walker* noted that an inspector periodically visited the work site, although he "never 'participated' in any job operation but merely inspected the construction site to determine whether the work was being performed in accordance with the specifications in the contract...." 17 Ohio App.3d at 22, 477 N.E.2d 1160. The court reversed a summary judgment in favor the defendant, finding "that sufficient evidence was presented to establish a retention of custody and control over the construction site by Mid-States and to raise an issue of fact ... whether, by the reasonable exercise of the rights retained by Mid-States by virtue of its contract with Stout, Mid-States could have discovered and eliminated the hazard which caused [plaintiffs' injuries]." *Id.*

Once it is determined that the United States owed decedent a general duty of care, the more specific question is whether it had a duty to warn him of the specific hazard that caused his injury.

> "The occupier is not an insurer of the safety of invitees, and his duty is only to exercise reasonable care for their protection. But the obligation of reasonable care is a full one, applicable in all respects, and extending to everything that threatens the invitee with an unreasonable risk of harm. The occupier must not only use care not to injure the visitor by negligent activities, and to warn him of latent dangers of which the occupier knows, but he must also inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use. The obligation extends to the original construction of the premises, where it results in a dangerous condition."

*Cyr v. Bergstrom Paper Co.*, 3 Ohio App.3d 299, 301, 444 N.E.2d 1349 (1982) (quoting Prosser on Torts 392–93 (4th ed. 1971)).

In short, it is hornbook law that the government's duty to decedent extended only to those dangers that were reasonably foreseeable. The District Court acknowledged the relevance of foreseeability in its remarks during the trial, but seemed to regard as unforeseeable either that any fre-

---

**14.** They are quoted by the court as follows:

"1.10 *EMERGENCIES*

"In an emergency or threatened emergency affecting or liable to affect the safety of life or property, either party shall have the right and authority to stop the work and/or *order and direct such changes therein or in the methods, plant and tools used by the Contractor or Owner,* as necessary in the circumstances."

"1.12 *INSPECTION AND TESTING*

"All plant to be provided, work to be performed, and material and equipment to be supplied pursuant to the contract *shall at all reasonable times and on reasonable notice be subject to inspection and testing by Owner or its inspector....*" (Emphasis added.)

17 Ohio App.3d at 21–22, 477 N.E.2d 1160.

quenter of the premises would be in a position to make contact with the high voltage wire, or that in this particular instance

15. Typical of the exchanges between the court and counsel is the following, which took place during closing arguments:

THE COURT: I have no questions other than the one I raised, Mr. Anninos, and that has to do with the duties upon the United States under Ohio law to save the plaintiff from his own folly which is really what we are talking about.

MR. ANNINOS: ....

As your honor knows, the United States admitted possession, custody, and control of the instrumentality, and there is no question about that. And because Mr. Angel was there as an invitee with respect to that instrumentality, they owed a duty to him to keep it safe.

THE COURT: Mr. Anninos, that raises a question that has been troubling me since the outcome of the case. That installation was safe. There is no way that any person unintentionally by himself could be subjected to danger.

There is no way that any individual walking on the ground, unless he carried some metal object 19 feet long, was in any danger whatsoever. Actual, theoretical, whatever.

MR. ANNINOS: You heard Dr. Garrett say that you could extend between two and three feet—

THE COURT: From the wire which is still 19 and a half feet off the ground.

MR. ANNINOS: So that if you had an object—

THE COURT: This is precisely the point. How many people do you know who carry around a 16 foot metal object routinely?

Would your position be different, for example, if the electrical wire was two feet off the ground and could be touched by an umbrella?

Wouldn't that be a totally different condition of danger?

MR. ANNINOS: I didn't catch the last part, Your Honor?

THE COURT: I am suggesting to you that if this wire were, say, seven feet off the ground, and an individual carrying an umbrella over his head came into contact with it and was electrocuted, would that not be a totally different situation than the same wire 19 feet off the ground?

MR. ANNINOS: Your Honor, the only difference it would make is that the seven foot of the wire would be totally outside code.

THE COURT: Mr. Anninos, you are missing my point. You and I have a problem with communicating.

I am suggesting to you that where there is a danger that is reasonably likely to cause harm, the obligation is simply different.

It is foreseeable that somebody will be walking along the street with an umbrella, a metal umbrella over his head. It is not equally foreseeable that somebody will be walking with a 19 foot umbrella or any other object. And I suggest to you that the obligation bears upon foreseeability.

There is an effective use of space concept, isn't there? Human beings can occupy roughly six feet of space from the ground. If they are exceedingly tall, it may be seven feet. They can extend their arms for perhaps another two feet. But when you start getting above that space, isn't there a difference in foreseeability?

MR. ANNINOS: The foreseeability, with that, also goes along with the type of usage that the space is placed onto.

I agree with you if there were not to be any ladders there and there wasn't to be any sandblasting work there that an individual walking through would not be foreseeable under most circumstances that he would get electrocuted.

However, let's now set the scene, and the workman comes in with a ladder. And it becomes immediately apparent now that this space—

THE COURT: Be careful. Not a ladder. A metal ladder. And not just any metal ladder. A twenty foot metal ladder.

There are an enormous number of ladders that would not be metal, that would be metal and less than twenty foot. And in those instances there would be no danger.

You must postulate a person in that area with something nineteen feet long and made out of metal.

MR. ANNINOS: All right. When I said "a letter," [sic] I didn't mean any old ladder. I meant the ladder we had in this case.

And with that ladder there, that whole area becomes a potential for danger.

THE COURT: By the carrier of the ladder.

MR. ANNINOS: For the sake of argument, and without any admission on my part, let's even assume that that was negligence on his part to bring the ladder within that area.

Now, the day before that, we have Mr. Gibson inspect it, go to the site, talking to the people, and seeing aluminum ladders.

THE COURT: You will agree, Mr. Anninos, that the point I made yesterday, there is no prohibition on bringing aluminum ladders onto the base. There is no prohibition against using it on the other three sides of the building.

MR. ANNINOS: I agree with you, but once the ladder is there, don't you owe that person one warning to tell him, "Look, this is dangerous. Don't use this ladder on this wall."

THE COURT: All right. Let's bring down what we have now.

the decedent would act negligently in bringing the aluminum ladder in proximity with the wire.[15] Nevertheless, the court

made no specific finding whether harmful contact with the high voltage wire in question was unforeseeable, either generally or under the specific circumstances in which decedent was working. *Cf. McGarry v. United States,* 549 F.2d 587, 590 (9th Cir. 1976) ("The power line was owned by the United States. It was to be contemplated that contractors would engage in work in its neighborhood, and the AEC here was aware of the location of the exploratory hole."); *United States v. Haskin,* 395 F.2d 503, 506 (10th Cir.1968) (worker painting government building touched ladder to adjacent power line) "[T]he danger should have been foreseen or anticipated; however, the evidence showed no warning signs of any kind were maintained in the immediate area where the accident occurred. No specific warnings were given to Transco or its employees.").

The District Court should make a finding as to whether it was foreseeable when this installation was constructed that at some point persons working either on or near it would come in close proximity with this wire, and that some sign or other warning on the installation was appropriate. Contrary to the assertion of the government, the installation itself, although elevated, does not in and of itself serve as a warning

> We now have a situation where this is not a dangerous situation for a wooden ladder, for any ladder being below 20 feet, and not dangerous for any work on three sides of the building. The only danger occurred when you bring that ladder onto the north side of the building and bring it into proximity with the obvious electrical installation.
>
> Are you suggesting that that imposes a duty, that incredibly small window of obligation imposes a duty upon the United States to foresee it and prevent it.
>
> ....
>
> [Mr. Angel] is in total control. He has got the unique device that creates danger. That transformer sitting there 19 and a half feet off the ground is no danger to anyone other than a very low flying airplace [sic].
>
> It is no danger to a person walking. It is a danger only to that person with a 19 foot metal object in proximity to his body.
>
> ....
>
> He is in total, sole, complete control of that danger object which would conduct electricity.
> [Tr. III–84–89, 91–92]

under Ohio law. *See Lazar,* 43 Ohio St.2d at 143–44, 331 N.E.2d 424:

> The presence of a conspicuously posted sign, warning of danger due to high voltage power lines, will normally be sufficient to put the reasonable man on notice. Power lines strung from towers, flung far into the sky and away from human habitation, may well be adequate to all.... But ... those warning signs and towers are not included in the circumstances of this case [power line sagging near residential roof touched by TV antenna installer].

As to the sign that the District Court found to be present on the transformer installation, the court made no finding respecting whether it was conspicuously placed or legible at the time of the accident. The evidence in the record on this question is conflicting.[16] The District Court is directed on remand to determine whether the sign was legible and conspicuous.[17]

The District Court should also determine whether it is foreseeable that sandblasters working on a building the peak of which is four and one-half feet below and seven feet distant from a high voltage line might come in contact with it during the course of

16. Moreover, the government's expert witness testified, and the government argues in its brief on appeal, that the height of the sign's placement demonstrates that it was not intended to warn a person on the ground, but only a workman on the platform itself. As the many ladder, scaffold, crane and other accident cases suggest, however, workmen on the ground often make contact with overhead lines, and such contact may be foreseeable.

17. Plaintiff complains that the court erred in excluding testimony pertaining to the disappearance of the sign in the interval between the accident and trial. It contends that this evidence should have been admitted, because if it was shown that the sign disappeared while in the custody of the government while plaintiff's suit was pending, plaintiff would be entitled to an inference that the sign was illegible and inconspicuous. In refusing to admit this testimony, the District Court correctly observed that it was irrelevant, since there was ample evidence in the record of the actual appearance of the sign. We find no error in the court's ruling.

the work. *See Strother v. Hutchinson,* 67 Ohio St.2d 282, 287–88, 423 N.E.2d 467 (1981) (per curiam) (" '[I]f an event causing injury appears to have been closely related to the danger created by the original conduct, it is regarded as within the scope of the risk, even though, strictly speaking, the particular injury would not have been expected by a reasonable man in the actor's place.' " (quoting *Di Gildo v. Caponi,* 18 Ohio St.2d 125, 130, 247 N.E.2d 732 (1969), quoting Restatement (Second) of Torts § 281 comment g)). In particular, if DESC inspector Gibson observed the aluminum ladders on the site, the possibility of injurious contact with the wire may have been foreseeable,[18] even if bringing the ladder into contact with the wire would have been negligence on the part of the person doing so. *See Taylor v. Webster,* 12 Ohio St.2d 53, 231 N.E.2d 870 (1967); Restatement (Second) of Torts § 302A (1965). The District Court made no findings or mention of Gibson's visits to the work site or of Gibson's knowledge or responsibilities. On remand, the court is directed to make findings relevant to the foreseeability to the government of decedent's injury.

### C.

The District Court found that decedent, as an employer within the meaning of the OSHA regulations, violated 29 C.F.R. § 1926.450, prohibiting the use of metal ladders where they may come in contact with electrical conductors. As previously noted, there is also an OSHA regulation, 29 C.F.R. § 1910.305(5)(E)(ii), which requires the posting of warning signs on transformer installations. We cannot discern from the District Court's opinion what significance it attributed to such violations.

In *Teal v. E.I. DuPont De Nemours & Co.,* 728 F.2d 799 (6th Cir.1984), this Court held that a state law rule, that the breach of a duty imposed by regulation is negligence *per se* if the plaintiff is a member of the class of persons which the regulation was intended to protect, would extend to violations of OSHA regulations. Such is the law in Ohio. *See Freeman v. United States,* 509 F.2d 626, 630 (6th Cir.1975). The Court also held that an employer's duty under OSHA regulations enacted pursuant to the specific duty clause, 29 U.S.C. § 654(a)(2), extends to *all* employees frequenting an employer's workplace, including those of an independent contractor. 728 F.2d at 804–05. On remand, the District Court should consider whether either or both the decedent and the government were negligent *per se* in light of the applicable law and regulations.

### D.

On remand, should the District Court find, in light of our opinion, that the government had a duty to warn the decedent of the presence of the high voltage wire and danger of using an aluminum ladder in its vicinity, we emphasize that such a finding does not place the government in the position of an insurer. We agree with the District Court that the government was not required to monitor constantly the decedent's work site to insure that the ladder would not be brought into contact with the electrical wire. All that was required was a reasonable warning under the circumstances. *See Thomas v. TVA,* at 371; *cf. McGarry,* 549 F.2d at 590–91:

> This need not as a matter of law entail presence of an AEC inspector on each occasion of work performed in the neighborhood of the power line. If, here, the AEC had made regular examinations to ascertain the practices being followed by REECO, and was reasonably satisfied from its examinations that appropriate guidelines were being followed, this might well have been found by the trier of fact to suffice. No such examination

---

18. In this regard, we note the District Court's finding that the ladder was standing against the north side of the building on Saturday morning prior to the start of work, when Gibson testified he visited the site. *Cf. Thomas v. TVA,* at 373

(Wellford, J., concurring) ("Thomas does not even claim that TVA negligently failed to warn about a safety condition of which it had particular knowledge at the specific place of the accident.").

was conducted here and the district court found that the AEC had failed to exercise reasonable or any care to see that proper safety precautions were taken by REECO with reference to work performed in the neighborhood of the power line.

*See also Palaidis v. United States,* 564 F.Supp. 1397, 1402 (M.D.Fla.1983) (two prior warnings to use proper safety precautions while working around electrical installations imputed to accident occurring on subsequent occasion where no warning was given).

Nor, as argued by the government, does the SAB/DESC-White contract relieve the government of any liability it might have incurred under the facts of this case. ASPR ¶¶ 7-602.42(a) & 7-602.43 provide that safety compliance is and remains the responsibility of the prime contractor regardless of whether or not the government inspects. However, the contract does not and cannot absolve the government of any liability for breach of its own duty of care. *Cf. Aretz v. United States,* 604 F.2d 417, 430 (5th Cir.1979):

> As we read the language of the contract as set out in the statement of facts, however, it does not disclaim any existing liability on the part of the government; it merely provides that the safety provisions of the contract do not relieve the contractor of any safety responsibilities toward his employees and do not "impose or add to" the government's liability. Thus, while it indicates that the government undertook no safety duties by the terms of the contract, it does not appear to disclaim any liability which arises outside the contract, as did the government's duty and liability in this case.... Georgia law provides that, although parties to a contract may adjust tort liability among themselves, they cannot by contract relieve themselves from any liability to a third person where otherwise they would be liable. [*Accord Jacob v. Pennsylvania R.R.,* 203 F.2d 290, 293 (6th Cir.1953) ("the right of appellant to maintain her action in the instant case [is] sustained by the authority of the Voigt case on the ground that Mr. Jacob himself entered into no contract relieving the railroad from liability").]

To the extent that the effect of the SAB/DESC-White contract is that White agreed to assume the government's duty of care or to indemnify or hold harmless the government for its own negligence, that is an issue that would have to be resolved in the third-party action between the government and White. It would not affect plaintiff's claim, unless the District Court determines on remand that plaintiff's decedent was a party to the SAB/DESC-White contract. Nor does the fact that the District Court correctly ruled in favor of defendant's motion for partial summary judgment on the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), bear on this issue. The government contended that providing by contract that White would be responsible for safety was the exercise of a discretionary function. The District Court correctly rejected the government's subsequent contention that, in ruling in its favor on this motion, the court effectively found for the government on the duty to warn issue as well. "[T]he discretionary character of the government's initial safety undertakings [does not] govern whether a duty can arise out of those undertakings." *Aretz,* 604 F.2d at 431 n. 18.

### E.

Appellant contends that the District Court erred in refusing to permit additional questioning of Messrs. Slusher and Kallmeyer. Fed.R.Evid. 103 provides:

> (a) **Effect of erroneous ruling.** Error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the part is affected, and
>
> ....
>
> (2) **Offer of proof.** In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the

context within which questions were asked.

■ Appellant does not point to error in rulings on particular questions asked the witnesses. Rather she relies upon a proffer or statement by counsel as to what the witness would have been asked which, while made on the record, was not made in the judge's presence. Although this proffer enables us to know whether the evidence affected a substantial right of the party, the procedure used did not afford the court the opportunity to rule on whether the evidence should be admitted. "[T]o preserve error in a ruling on evidence a party must notify the trial court of his position and the specific rule of evidence on which he relies." *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir.1979). The District Court did sustain an objection to Mr. Slusher testifying further about the manner in which sandblasting was conducted. It held the evidence irrelevant since the deceased was not sandblasting at the time he was injured and further, that two witnesses had already testified about it. Although plaintiff in her proffer, and in her brief in this Court, stated that the evidence was relevant to prove that a twenty-foot ladder was required to work on a fifteen-foot peak of the building, this relevance was never pointed out to the District Court. Nor would it be obvious to the Court why this evidence was relevant. The other matters that appellant claims were improperly excluded were not even alluded to in the questioning of these two witnesses. Under these circumstances we find no error in excluding the evidence.

### F.

Once the District Court has reconsidered the question of decedent's and the government's negligence in light of our opinion, the court is directed if it finds the government negligent to make specific findings as directed by the Ohio comparative negligence statute, O.R.C. § 2315.19, apportioning fault for the accident:

(B) In any negligence action in which contributory negligence is asserted as a defense, the court in a non-jury trial shall make findings of fact, ... that shall specify:

. . . .

(2) The percentage of negligence that directly and proximately caused the injury, in relation to one hundred per cent, that is attributable to each party to the action.

### III.

Plaintiff also appeals from the District Court's denial of her request pursuant to 28 U.S.C. § 1825 that the government pay her witness fees. The court relied upon *Johnson v. Hubbard*, 698 F.2d 286 (6th Cir.1983), in holding that § 1825 did not authorize it to order the United States to pay witness fees for an indigent opponent in a civil case.

Although in *Johnson* this Court referred to § 1825 as the "criminal law counterpart" of 28 U.S.C. § 1915(c), by which courts may waive certain court fees where a party is declared indigent, 698 F.2d at 289–90, the Court's statement was dictum and not dispositive of plaintiff's claim for two reasons. First, the claim in *Johnson* was made under § 1915. Second, the United States was not a party to the case.

We are doubtful that the payment of witness fees by the government in civil cases in which the United States is a party is mandatory under § 1825. *But cf. United States Marshals Service v. Means*, 741 F.2d 1053, 1060–61 (8th Cir.1984) (en banc) (Gibson, J., concurring). However, until there is a finding as to whether at the time relevant to plaintiff's fees request she was indigent, there is no need to address this issue. The government contends, and plaintiff has not denied, that she settled her claim against White immediately prior to trial for $25,000. If she was not indigent she would not be entitled to fees.

### IV.

The orders of the District Court dismissing plaintiff's FTCA claim and fees request are vacated, and the case is remanded for

further proceedings consistent with this opinion. IT IS SO ORDERED.