Clifford **GOWDY**, Plaintiff-Appellee,

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

No. 18744.

United States Court of Appeals
Sixth Circuit.
June 20, 1969.

J. F. Bishop, Atty., Dept. of Justice, Washington, D. C., for appellant; Edwin L. Weisl, Jr., Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., Harold D. Beaton, U. S. Atty., Grand Rapids, Mich., on brief.

Harry M. Philo, Detroit, Mich., and William G. Reamon, Marcus, McCroskey, Libner, Reamon, Williams & Dilley, Grand Rapids, Mich., for appellee.

Before WEICK, Chief Judge, EDWARDS, Circuit Judge, and McALLISTER, Senior Circuit Judge.

WEICK, Chief Judge.

United States has appealed from a judgment of the District Court in favor of plaintiff, Gowdy, in the amount of $289,248.82, in an action for personal in-

juries brought under the authority of the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b) and 2671 et seq. The opinion of the District Judge is reported in 271 F.Supp. 733 (1967).

Gowdy was a journeyman electrician employed by Whittaker Electric Company [Whittaker], an independent contractor, which had a contract with the Coast Guard to install new electrical machinery in a machinery house which was part of a lighthouse located on a breakwater on Lake Michigan. The beacon tower of the lighthouse extended upward from a part of the flat roof of the machinery house. Entrance to the lighthouse was gained from inside the machinery house.

While operating a hand hoist or rachet on the flat roof of the machinery house, Gowdy lost his balance and fell eleven feet to the ground, sustaining comminuted fractures of both heels. He was awarded Workmen's Compensation benefits under Michigan law as an em-ployee of Whittaker, but sued the Government as a third-party tortfeasor.[1]

In his complaint, Gowdy alleged negligence on the part of the Government in the following respects:

1. In hiring an incompetent contractor;

2. In not exercising reasonable care in the performance of its right of control over plaintiff's employer;

3. In furnishing unsafe equipment;

4. In giving ambiguous orders to an independent contractor;

5. In failing to warn plaintiff of the dangerous condition of the lighthouse; and

6. In failing to provide a reasonably safe place to work.

The District Court found only that the Government was negligent in one particular, namely, in failing to install a guardrail around the flat roof of the machinery house so as to prevent plaintiff's fall therefrom.

## IS ADMIRALTY LAW APPLICABLE?

At the outset we must determine whether maritime law applies to this claim under the Federal Tort Claims Act, as was held by the District Court. 271 F.Supp. at 738.

■ The Federal Tort Claims Act provides a remedy on claims against the United States for—

"* * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)

The words "law of the place" have been construed to require the application of the "whole law" of the state where the act or omission occurred. Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). This would include the state's rules on choice-of-law.

Should it be determined that the tort here involved required application of maritime law, a state court would be required to apply that law. Hess v. United States, 361 U.S. 314, 318, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960). See Ira S. Bushey & Sons Inc. v. United States, 276 F. Supp. 518, 524 (D.C.N.Y.1967), aff'd on other grounds, 398 F.2d 167 (2d Cir. 1968).

The District Court relied upon the traditional test of the locality of the tort in determining whether maritime law must be applied. Principal reliance was placed upon Wiper v. Great Lakes Eng'r Works, 340 F.2d 727 (6th Cir. 1965), cert. denied, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 and Hastings v. Mann,

---

1. The Government filed a third party complaint against Whittaker, which the District Court ordered separated from the plaintiff's action. The third party action was compromised by Whittaker's agreement to pay one-half of any judgment finally recoverable against the United States.

340 F.2d 910 (4th Cir. 1965), cert. denied, 380 U.S. 963, 85 S.Ct. 1106, 14 L. Ed.2d 153.

The present case, however, is one of those "troublesome borderline cases" in which the locality test alone is not sufficient. Chapman v. City of Grosse Pointe Farms, 385 F.2d 962, 964–966 (6th Cir. 1967) (decided after the District Court rendered its judgment).

In view of the fact that the lighthouse was located at the end of a breakwater,[2] the Government contends that it falls within the land extension doctrine because the "accident * * * was on an unbroken extension of land," and that, therefore, there is no basis for applying admiralty law. It argues that the lighthouse was not, strictly speaking, surrounded by water.[3]

The District Court, on the other hand, noted that lighthouses are generally not encompassed within the land extension doctrine, Hastings v. Mann, *supra*, 340 F.2d at 911, and that a breakwater is distinguishable from a wharf or pier, since its purpose is to break the force of the waves. This analysis aids us no more than did the analysis of the locality test in *Chapman*. After concluding that the locality test alone would place the case within admiralty jurisdiction, this Court stated in Chapman v. City of Grosse Pointe Farms, *supra*, 385 F.2d at 965:

"The second question presented * * is whether locality of the tort alone is sufficient to confer admiralty jurisdiction upon the district court. In light of the fact that the purpose of the constitutional provision (U.S. Const. art. III, § 2) underlying section 1333 was to achieve uniformity in the area of maritime commerce * * * doubt might well exist as to whether locality alone should be the sole controlling factor in determining the existence of federal admiralty jurisdiction."

◼ Nor is the fact that the lighthouse itself serves a maritime purpose sufficient to require in this case application of maritime law.

In *Chapman* the Court stated the following principle:

"While the locality alone test should properly be used to exclude from admiralty courts those cases in which the tort giving rise to the lawsuit occurred on land rather than on some navigable body of water, it is here determined that jurisdiction may not be based solely on the locality criterion. A relationship must exist between the *wrong* and some maritime service, navigation or commerce on navigable waters. Absent such a relationship, admiralty jurisdiction would depend entirely upon the fact that a tort occurred on navigable waters; a fact which in and of itself, in light of the historical justification for federal admiralty jurisdiction, is quite immaterial to any meaningful invocation of the jurisdiction of admiralty courts." [Italics ours] *Id.*, 385 F.2d at 966.

Here the "wrong" if any, involved the failure of a landowner to provide a guardrail or some type of warning for business invitees using the property. The invitees were an electrical construction company and its employees engaged in the installation of new machinery in the machinery house. The company was not a maritime contractor, and its employees were not seamen, longshoremen or harbor workers.

◼ The "wrong" bears no relationship whatever to "some maritime ser-

2. The breakwater was constructed of concrete and stone supported by piles sunk into the bottom of the lake. The breakwater extended about 1000 feet west from the east shore of Lake Michigan. The machinery house rests on an elevated foundation about three feet above the breakwater.

3. Whittaker's Superintendent Curow testified that he walked on the breakwater, out to the site, on at least two occasions. There was, however, no loading or unloading of ships on the breakwater.

vice, navigation or commerce on navigable waters." The application of maritime law in this case would not, therefore, serve the purpose of uniformity in the area of maritime commerce.

■ In view of the fact that there are no other choice-of-law problems, e.g., multistate problems, we hold that Michigan substantive law is applicable to this case.

## NEGLIGENCE

The accident happened in broad daylight. Gowdy was familiar with the flat roof as he had been on it a number of times before the mishap. Gowdy admitted that he knew that the roof had no guardrail and that if he was not careful he might fall. Notwithstanding all of this knowledge, the District Judge found that the absence of the guardrail "presented a deceptive and hidden danger to the Plaintiff"; that once he was "lulled into a sense of security, he could easily be lured into a position of danger"; and that it was "a subtle and alluring hazard." 271 F.Supp. at 745 and 744.

■ Whittaker, plaintiff's employer, who was alleged by plaintiff to be an incompetent contractor, had been regularly engaged for many years in the construction of heavy and medium industrial projects, with extensive experience with the hoisting of heavy equipment. It did an annual business of $1.5 million. It employed about one hundred persons at that time, and now has one hundred thirty employees. There was no proof that Whittaker was an incompetent contractor, or that the Government had knowledge of any alleged incompetency. In any event, the award of contracts by the Government involves a "discretionary function or duty," in the exercise of which it is exempt from liability under the Federal Tort Claims Act. 28 U.S.C. § 2680(a), and Dalehite v. United States, 346 U.S. 15, 42, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

■ The Government was not required to exercise any supervision or control over its independent contractor and is not liable for failure to do so. The mere reservation of the right to inspect the work did not impose upon the Government any duty of inspection or control. Grogan v. United States, 341 F.2d 39, 42 (6th Cir. 1965). Nor is the Government liable for the negligence of the independent contractor as the Act limits liability to injuries "caused by the negligent or wrongful act or omission of any employee of the Government * * *." Grogan v. United States, *supra*.

The Government furnished no equipment to the contractor. It did permit the contractor to use a davit for the purpose of hoisting machinery. The davit was fastened on the edge of the flat roof of the machinery house and extended to a height of about ten to twelve feet above it. There was no proof that the davit was defective or that the davit had anything to do with causing the plaintiff to lose his balance and fall from the roof.

There was no proof that the Government gave ambiguous or any other kind of orders or instructions to the contractor. Whittaker's Superintendent Curow testified:

"Q Did you receive any orders and instructions from anybody in the coast guard?

A Not that I can recollect, although it was visited on two occasions by representatives of the coast guard who looked the work over to see that it was done to their satisfaction.

* * * * * *

Q Did you see any equipment that was being used for this purpose at that time?

A I supplied the hoist with which it was to be removed, and replaced, yes.

* * * * * *

Q And did you ever meet with anybody from the coast guard as to how the work might proceed?

A No, I don't recollect that the coast guard at any time gave any instructions as to this."

The fifth and sixth specifications of negligence may be considered together. The mishap did not occur on the lighthouse part of the structure. Plaintiff needed no warning to tell him that the flat roof of the machinery house had no guardrail around it as that fact was plainly visible to anyone. Nor did he need anyone to tell him that if he worked too close to the edge of the flat roof and lost his balance he might fall. As we will show below, he was not required to be on the roof in order to do the work he was performing at the time of the accident, for he could have operated the hoist from the ground level.

The contract with the coast guard required Whittaker to "provide competent superintendence" and to "take precautions necessary to protect persons or property against injury or damage."

The work was performed under the supervision of Whittaker's Superintendent, Frederick Curow, who had been employed by Whittaker for seventeen years. He had inspected the site twice in estimating the bid for the contract, and visited it every third day and some times more frequently. Curow supplied the ratchet hoist which Gowdy was using at the time of the accident. Charles Smith was the foreman in charge, and he and Gowdy did the work. It was Smith who gave Gowdy instructions as to the use of the ratchet. The Government cannot be held liable for the failure of Whittaker's superintendent, Curow, and its foreman, Smith, to supervise the work and to give proper instructions to Gowdy as to how to use the employer's hoist.

The Government had delivered the machinery to the site and it was the function of the contractor to install it in the machinery house. In order to install the machinery in the building it was necessary to remove the metal door of the machinery house, which provided entrance at ground level. It was the job of the contractor to remove the door each morning and to replace it at the end of the work day, about four o'clock P.M. Prior to the mishap, Gowdy had done this without injury eight or ten times.

Because of the weight of the metal door, it had to be lifted by a hoist or block and tackle, and then swung in or out of place, depending on whether it was being removed or reinstalled. A hoist or block and tackle could be attached to the davit on the roof of the machinery house. Chief Bosun Mate James W. Gilligan of the Coast Guard gave permission to the contractor to use the davit.

The work of lifting the door could have been performed at safe ground level simply by attaching lengths of chain or choker to the eye of the davit. Chokers were supplied to Gowdy by his employer. Instead of attaching them to the davit, Gowdy attached the hoist ratchet itself directly to the eye of the davit. The ratchet was only about eighteen inches in length. In operating the ratchet, Gowdy reached above his head, and out, being able to grasp only about three inches of the handle. This was done while he was standing about one foot from the edge of the roof, on the balls of his feet, and leaning toward the edge. While pumping the ratchet in this stance, Gowdy lost his balance and fell. By attaching lengths of chain or a choker to the davit, Gowdy could also have operated the ratchet on the roof but at waist level.

Gowdy testified on cross-examination as follows:

"Q Now, who gave you instructions as to how to perform the operation that you were engaged in just prior to your injury?

A My foreman."

Gowdy received no orders or instructions of any kind from any employee of the Government. Nor did the Coast Guard give any instructions or orders to Superintendent Curow.

In his testimony at the trial, Gowdy was unable to tell the Court just what caused him to lose his balance and fall. His foreman, Smith, who was present, did not see him fall.

On direct examination, Gowdy testified:

"Q And would you tell the Court exactly what happened as best you remember it?

A I don't actually remember. The only thing I do remember is trying to catch my balance of getting back on the roof. I was started out [sic] and I remember how you wave you hands—In other words, try to get your body back, and I couldn't get back. And the next thing I remember, I lit down beside Chuck.

Q And on the lower level?

A On the lower level."

On cross-examination he testified:

"Q Can you give us any more specific details as to what you recall during the last few seconds and fractions of a second before you had the realization that you were losing your balance?

A All I can remember that I was trying to catch my balance. I was trying to get back on this roof or platform. I was attempting to.

Q But at this time you were already in the process of falling?

A I had already lost my balance.

Q And you were in the process of falling?

A I hadn't left it yet. I mean, I hadn't left that platform yet.

Q But you were on your way, though?

A Yes, I guess I was on my way.

Q Right. Just before you had that sense of losing your balance, what do you remember about those few seconds or few fractions of a second?

A I don't remember nothing. In other words, I have no recollection of—

Q Did someone push you?

A Nobody pushed me, no.

Q Did you black out, or lose consciousness?

A No.

Q You have absolutely no memory whatsoever of the—just the last few fractions of a second before you had this sensation of losing your balance?

A The only recollection that I have, that I was trying to get back on that roof.

Q But before that time it's just—

A Before that time I was working the hoist up to that time I lost my balance; I have no recollection of what happened. I don't know."

Since Gowdy did not know what caused him to lose his balance and fall, there would seem to be no basis to speculate that it was the negligence of employees of the Government, rather than the negligence of Gowdy or of the contractor, in giving improper instructions or in failing to properly supervise the work of its employees.

It was not the function of the Government to instruct the contractor's employee, Gowdy, how to use the ratchet hoist. Nor did the Government incur liability by not having personnel present during the course of construction to make sure that the contractor's employees were properly using the contractor's equipment. Bosun Mate Gilligan testified that on occasions when he was out at the site, "they had a hoist hanging but I don't recall what it looked like. I didn't pay that much attention to it. * * * I don't remember whether the ratchet was attached, if it was up at the ring or arms-level. * * * Some part of it was hooked to the top of the davit, yes."

The evidence of knowledge on the part of the Government that Whittaker's employees were using the flat roof of the machinery house as a work area is quite sketchy. Gilligan, who was called as a witness by plaintiff, testified:

"Q And did you, in the course of this work, see employees engaged in the performance of the Whittaker contract working at the second level, or moving up from the lower level

to a higher level involving the second level?

A I don't know. When I was out there, I generally went out and talked to the foreman. I didn't pay much attention when I walked in where one guy was standing or the other one. I probably seen them up there. Maybe I did or didn't; I don't recall."

We would doubt that this kind of evidence, offered by the party who has the burden of proof, would qualify even under the scintilla rule.

The District Judge applied Michigan substantive law on the issue of negligence. In, view of our holding that admiralty law does not apply to this case, we also apply Michigan law to the substantive issues involved here.

To support the finding of negligence, the District Judge relied on Ackerberg v. Muskegon Osteopathic Hospital, 366 Mich. 596, 115 N.W.2d 290 (1962), which involved only the question of whether the trial court erred in directing a verdict in favor of defendant at the close of plaintiff's evidence. In Ackerberg the plaintiff fell from a platform which was elevated from two to three feet above the ground. This platform led to the emergency entrance which in turn led to the emergency room of the hospital, and was used by the public in entering and leaving the hospital. Plaintiff testified that because of a strong odor in the emergency room and the injury to his child, he became nauseated and a little dizzy. Feeling the need of fresh air, he walked out through the emergency entrance onto the rear platform, where he fell to the ground. The Court stated:

"The test, then, in the instant case is, would all reasonable men agree as to whether or not defendant hospital had a duty to construct a guard or protection around the rear platform which was used by the general public entering and leaving the emergency

entrance of the hospital in an excited state.

"The declaration alleges that defendant hospital knew or ought to have known that people using the emergency entrance would be under the strain of physical and emotional shock and, in the exercise of reasonable care, should have provided a guard of some type on this platform.

"We think when situations such as this arise, considering the attendant excitement and the mental and emotional condition of the individuals entering and leaving an emergency entrance to a hospital, reasonable men might differ as to whether or not there was a necessity for the construction of a guard rail to protect those on or about the platform as business invitees." Id. at 601, 115 N.W.2d at 293.

Gowdy's attention to his work certainly does not raise the same inability to protect himself from obvious danger as the emotional and mental excitement involved in Ackerberg, where the plaintiff's ability to perceive the danger may have been limited by the circumstances. No one pushed Gowdy. Although he could not remember what happened, he did not black out or lose consciousness prior to the fall. He simply lost his balance and fell from the roof.

In Ackerberg the Court further said at page 602, 115 N.W.2d at page 293:

"We do not decide in this case that plaintiff is entitled to recovery, but merely that there is a question of fact as to defendant's negligence which should be submitted to a jury."

■ Our case does not involve any question as to whether the Court should or should not have directed a verdict, or should have granted or refused to grant a motion to dismiss. The question here is whether under Rule 52(a) of the Federal Rules of Civil Procedure the finding of the District Judge that the Government was negligent is clearly erroneous.

In United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the Court held:

"A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

In Wright on Federal Courts, the author says at page 377:

"In a non-jury case the appellate court can reject inferences which it deems clearly erroneous and can reverse a finding, though supported by substantial evidence, if the court is convinced on the whole record that the finding does not reflect the truth and right of the case." Citing Sanders v. Leech, 158 F.2d 486, 487 (5th Cir. 1946); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L.Ed. 746 (1948).

Assuming that the correct legal standard has been applied, the "clearly erroneous" test is applicable to a finding of negligence. Wright, *supra* at 376, citing McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954).

The District Judge also relied on McCord v. United States Gypsum Co., 5 Mich.App. 126, 145 N.W.2d 841 (1966), and said it was similar to our case since he found that "the absence of a guardrail presented a deceptive and hidden danger to the plaintiff." 271 F.Supp. at 745. We find no similarity in the facts of the cases. In *McCord*, plaintiff was working on a roof and fell through a skylight. He presented evidence tending to prove that the skylight was covered with dust and dirt and that the skylight was built into the roof so that it appeared to be a part of the roof and he could not see it. The Court held that this presented a factual question as to whether plaintiff was entitled to a warning of the dangerous condition, in the absence of which warning defendant was liable for his injuries. By contrast, the present case involves a "known and obvious danger." See 2 Restatement of Torts, Second, § 343A. Gowdy admitted that he knew there were no guardrails on this flat roof.

Suppose a homeowner contracts with a television supplier to erect an aerial on the roof of his house. The roof is a slanting roof, on which it is even less safe to work than a flat roof. The homeowner has no guardrails around the roof of his home. A repairman, employed by the supplier, while working on the rooftop loses his balance and falls to the ground, sustaining personal injuries. Is the homeowner liable (1) for not having guardrails around his roof so as to prevent the repairman from falling, or (2) for failure to warn the serviceman of a fact that he already knew, namely, that there were no guardrails? We say, "No."

The District Court, we think, was unduly impressed by the testimony of two former employees of the Government, who testified for the plaintiff as safety experts. They testified that the Government's failure to maintain guardrails around the roof created an undue risk which could not reasonably be guarded against by a workman on the roof, because he might become engrossed in his work and forget about the danger. Guardrails had been on the roof originally, but over the years they disintegrated and were removed.

The only inference which may reasonably be drawn from the evidence is that the davit had been used by the Coast Guard for the purpose of loading or unloading equipment or supplies, and that it might be necessary either to get up on the roof or to use a ladder to attach a block and tackle to the davit or to inspect or oil the davit. There was no proof that the Coast Guard ever used the roof as a work area, or authorized the contractor to make such use of it. The roof was never used to enter the lighthouse.

It is clear that it was not necessary for Gowdy to operate the ratchet hoist from the roof level for he could have op-

erated it safely from the ground. Nor was it necessary for Gowdy to place himself in what was at best a precarious position in which to operate the ratchet. Plaintiff's expert witnesses apparently did not consider the fact that it was unnecessary for Gowdy to perform the work he was doing from the roof level.

The District Judge was of the view from the testimony of the experts that the Government had knowledge in the field of safety engineering "unquestionably" superior to that of Gowdy or Whittaker, and therefore it owed a higher duty for the protection of Whittaker's employees. He stated:

"If the second deck of the lighthouse were not a working platform, and if the defendant in this case were a typical landowner unaware of the sophisticated nuances of safety engineering, we might probably agree that defendant discharged its duties to plaintiff." 271 F.Supp. at 740.

In the first place the wisdom of Gowdy's use of the flat roof as a working platform may well be questioned. It was necessary for him to be on the roof only to attach the hoist to the davit. Gowdy made the attachment without injury to himself. It was not necessary for him to operate the hoist from the roof top, as he could have operated it safely from ground level.

The mere fact that the Government may have had superior knowledge of safety standards did not increase its duty to exercise ordinary care. The Government was not performing the work, and Gowdy was not under its supervision or control. The District Court did not feel that it was doing anything other than determining the Government's superior knowledge of the danger here involved. 271 F.Supp. at 746. As before stated, the Government owed no duty of inspection and control of the operations of the independent contractor.

We do not believe expert testimony was needed to prove that one working on the edge of an elevated platform could be distracted and fall. Clearly, the question of whether it was foreseeable for a workman to be distracted and fall is within the competence of an ordinary layman.

"To warrant the use of expert testimony * * * the subject of inference must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman * * *." McCormick, Law of Evidence 28; Cohen v. Western Hotels, Inc., 276 F. 2d 26, 27 (9th Cir. 1960); and Henkel v. Varner, 78 U.S.App.D.C. 138 F.2d 934 (1943).

We hold that in this case the knowledge of safety standards on the part of the Government did not impose on it any greater duty than was applicable to a private person, particularly where, as here, such duty depends upon the foreseeability of another's failure to protect himself from a known and obvious danger.

The District Court characterized the hazard as "subtle and alluring," but this characterization does not withstand analysis. As noted above, Gowdy testified that he was aware of the fact that if he were not careful, he would fall.

Reliance by the Court upon the Government's expertise in this case may in effect make the Government an insurer of the safety of all who use its premises for business purposes under circumstances where private persons would not be liable. Michigan recognizes that " '[t]he occupier is not an insurer of the safety of invitees * * *.' " Kroll v. Katz, 374 Mich. 364, 373, 132 N.W.2d 27, 31 (1965), quoting Prosser, Law of Torts, 459 (2d ed.). The Act limits the liability of the Government to that of a "private person." Mider v. United States, 322 F.2d 193, 197 (6th Cir. 1963).

In our judgment, a flat roof without guardrails around it is not a dangerous instrumentality so as to im-

pose absolute liability on a property owner because of his ownership thereof. But even if the roof in the present case were considered dangerous, the Government would not be liable under the Federal Tort Claims Act merely because it owned dangerous property. The Supreme Court so held in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, wherein it said:

> "But the statute requires a negligent act. So it is our judgment that liability does not arise by virtue either of United States ownership of an 'inherently dangerous commodity' or property, or of engaging in an 'extra-hazardous' activity." Id. at 45, 73 S. Ct. at 972.

While plaintiff points to later Supreme Court decisions [4] which he claims place in doubt some aspects of *Dalehite* with respect to negligence at the operational level, no authority is cited which jeopardizes the trust of the principle that the Government cannot be held liable on a theory of absolute liability on account of mere ownership of dangerous property.

 This Court has recognized that the Government may not be held liable without fault in United States v. Taylor, 236 F.2d 649, 653 (6th Cir. 1956). See Mahoney v. United States, 220 F.Supp. 823 (D.C.Tenn.1963), aff'd, 339 F.2d 605 (6th Cir. 1964); United States v. Page, 350 F.2d 28 (10th Cir. 1965), cert. denied, 382 U.S. 979, 86 S.Ct. 552, 15 L. Ed.2d 470; and Prosser, Law of Torts, 1000–1001 (3rd ed. 1964).

 Since the Government may not be held liable without fault, it follows that the only basis for liability is negligence, if any, of Government employees in failing to warn Gowdy of the danger or in failing to provide guardrails to prevent the fall. But the Government was not required to warn Gowdy of something which he admitted that he already new, namely, that no guardrail

was on the flat roof and that it was dangerous for him to work too close to the edge of the roof because he might lose his balance and fall. Neither was the Government, under such circumstances, required to provide a guardrail. Thus we hold that the Government, as the owner of this flat roof, could not have anticipated that a reasonably careful workman would not protect himself from the known and obvious danger here involved.

We conclude from consideration of the record as a whole that a mistake has been made and the finding of the District Judge that the Government was negligent is clearly erroneous. United States v. United States Gypsum Co., *supra*.

## CONTRIBUTORY NEGLIGENCE

As to contributory negligence, the District Court stated:

> "Defendant's claim that plaintiff was guilty of contributory negligence is unfounded. From the testimony of defendant's former safety experts, we conclude that the attention of a reasonable and prudent workman, such as plaintiff, while working on the second deck of the lighthouse, would be concentrated almost exclusively on his work effort and that lulled into a sense of security, he could easily be lured into a position of danger." 271 F.Supp. at 745.

We disagree. Although this statement has some emotional appeal, it will not withstand analysis. While a landowner might under some circumstances foresee harm to a man on this platform, the issue here is whether under the circumstances Gowdy's behavior was reasonable. The only distraction involved here is that caused by the manner in which Gowdy operated the ratchet.

There are Michigan cases finding jury issues of contributory negligence, *e.g.*, Clark v. Dalman, 379 Mich. 251, 150 N.W.

---

4. Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Rayonier Inc. v. United States,

352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed. 2d 354 (1957).

2d 755 (1967); Dockham v. Marr, 373 Mich. 680, 130 N.W.2d 924 (1964); and Ackerberg v. Muskegon Osteopathic Hospital, *supra*. However none of these cases involves so obvious a danger with no substantial countervailing evidence of deception or distraction as in the present case.

The rule is stated in DeGrave v. Engle, 328 Mich. 565, 569, 44 N.W.2d 181, 183 (1950):

> " 'Normal persons must exercise their faculities for their own protection in order to avoid injury and must make reasonable use of their sight, hearing and intelligence to discover dangerous situations which may be presented,' " quoting from Dahlerup v. Grand Trunk Western R.R. Co., 319 Mich. 96 at 100–101, 29 N.W.2d 156.

As noted above, we reject the District Court's finding that the danger involved here was more apparent to the United States through its expertise than it was to Gowdy and his employer. It clearly appears that this work could have been done in a manner which would have avoided the injury, e.g., by attaching the hoist-ratchet so that it could have been used at ground level, or even at waist level. Thus, we are not faced with a situation involving no alternative.

As aptly stated in Jones v. Michigan Racing Ass'n, 346 Mich. 648, 654, 78 N.W.2d 566, 570 (1956):

> "If defendant was guilty of negligence in ignoring the existence of a condition of which it knew or should have known and which it should have foreseen would be dangerous to invitees, then plaintiff, who should have seen, as he did, and been aware, as he was, of its existence and have known, as he said he did, that it was dangerous, was equally guilty of contributory negligence for having ignored it and acting * * * in disregard of that danger."

 One is not required to pay exclusive attention to those features of his surroundings which involve risk of injury. One may allow his attention to be diverted; but whether or not he is justified in so doing depends on the circumstances of the case. See 2 Restatement of Torts, Second 45. In view of the facts that the danger was obvious and that Gowdy recognized its existence, we hold that the finding of the District Court that Gowdy was not negligent is clearly erroneous.

Nothing in recent Michigan cases forecloses a finding of contributory negligence, Dockham v. Marr, *supra*, Jones v. Michigan Racing Ass'n, *supra*, and Honorl v. J. L. Hudson Co., 10 Mich. App. 623, 160 N.W.2d 513 (1968), and this case clearly falls into that category. This contributory negligence bars plaintiff's recovery under Michigan law. Jones v. Michigan Racing Ass'n, *supra*, and Honorl v. J. L. Hudson Co., *supra*.

We need not determine whether Gowdy was contributorily negligent as a matter of law. We hold only that the finding of the District Court that Gowdy was not negligent is clearly erroneous.

The Government further contends that the award of damages in the amount of $289,248.82 for comminuted fractures of the heels, "made to a claimant able to walk, drive a car, and engage in sedentary employment, and under no substantial regime of pain medication" is grossly excessive, and that the District Court applied the wrong measure of damages.

In view of our holding with respect to the issues of negligence and contributory negligence, we need not consider the issue of damages, or the rules adopted by the District Judge in his opinion on damages.

The judgment of the District Court is reversed and the cause is remanded with instructions to dismiss the complaint.

EDWARDS, Circuit Judge (concurring).

I concur in the result reached by the court and join that portion of the opinion which holds this record shows no actionable negligence under the terms of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964).