Nadine M. SCHWAB, as Administratrix of the Estate of Michael Schwab; Nadine M. Schwab, Individually and Nadine M. Schwab, as Mother and Natural Guardian of Jennifer A. Schwab, Plaintiffs,

v.

UNITED STATES of America, Defendant and Third Party Plaintiff,

v.

CUYAHOGA WRECKING CORPORATION, Third Party Defendant.

No. 83–568–CIV–ORL–19.

United States District Court, M.D. Florida, Orlando Division.

Dec. 15, 1986.

Eugene C. Tenney, Buffalo, N.Y., James A. Sisserson, Melbourne, Fla., Thomas H. McDonald, Orlando, Fla., for plaintiffs.

Walter Postula, Asst. U.S. Atty., for U.S.

William D. Palmer, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Anne C. Conway, Orlando, Fla., for third-party defendant.

## MEMORANDUM OPINION

GEORGE KENDALL SHARP, District Judge.

This case is before the court upon the motion for summary judgment by the defendant United States (Doc. 67). On November 27, 1985, the court advised the parties that it would take the motion under advisement on January 1, 1986. On June 20, 1986, the court granted the motion for summary judgment, indicating that subsequently it would set forth the reasons for the summary judgment. This memorandum opinion articulates the basis for the order granting summary judgment for the United States.

## STATEMENT OF FACTS

In this wrongful death action, Nadine Schwab, individually, as administratrix of the estate of Michael Schwab, and as natural guardian of Jennifer Schwab, sues the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2680, for negligence in connection with the death of Michael Schwab. At the time of his November 17, 1977 death, Michael Schwab was employed by Cuyahoga Wrecking Corporation (Cuyahoga) as a crane operator. In the amended complaint, plaintiffs allege that the United States was negligent in failing to inspect the premises and equipment at the Complex 19 accident site, in failing to warn of dangers at Complex 19, in failing to provide a safe place for the decedent to work, in failing to properly supervise the work at Complex 19, and generally in failing to otherwise act prudently under the circumstances. Plaintiffs allege that the United States undertook to perform safety inspections on the equipment used by Cuyahoga and failed to do so, that the decedent relied on the government's undertaking to inspect the equipment, and that, as a result of the increased risk of injury to decedent caused by the government's failure to inspect, the decedent sustained the injuries which caused his death.

In the fall of 1977, Cuyahoga, a demolition company, was awarded a contract for the purchase and removal of launch facility equipment at Complex 19 of the Gemini-Titan launch facility at Cape Canaveral, Florida. The property, offered for sale by the Defense Property Disposal Service (DPDS) of the Defense Logistics Agency (DLA), Department of Defense, was sold to Cuyahoga on September 1, 1977, pursuant to DLA Invitation For Bid (IFB) No. 31–7410 and Contract No. 31–7410–003. The parties agree that the DPDS is an agency of the United States and that the complex was the property of the United States, as was the property to be removed prior to its sale. Since Complex 19, which had been abandoned since the mid–1960s, was being restored as an historical site for tours, some of the items at the launch facility were being retained. The contract required that Cuyahoga complete the work on Contract No. 31–7410–003 by December 9, 1977.

Cuyahoga began removal of the salvage property in September, 1977, and on November 16, 1977, the 21–year-old decedent was using a crane to perform the removal. The crane was owned or rented by Cuyahoga, and was not the property of the United States. Bobby Page, a Pan American World Airways (Pan Am) fireman, was at Complex 19 on fire safety watch on November 16, 1977, and witnessed the accident. According to Page, the decedent's crane was located on a horizontal cement launch pedestal approximately twenty feet above

the ground, and the crane was lifting an object out of an elevator shaft pit to the ground below the platform. The decedent's cousin was directing Schwab's maneuvering of the crane and the load at the time of the accident. As Michael Schwab was picking up the load, Page noticed that the left back crane outrigger was moving slightly up and down. As Schwab was lifting the load, this outrigger settled down firmly until Schwab moved the boom to the side to place the load on the ground. It was at this point that the crane overbalanced, slid 15 feet over the launch platform, and crashed to the ground, throwing the decedent out of the crane cab.

William Breyer, an Air Force safety specialist at Patrick Air Force Base (Patrick AFB), visited the accident site on November 17, 1977, and again on November 23, 1977, with an Occupational Safety and Health Administration (OSHA) compliance officer. Based upon their investigation of the accident, Breyer found that the accident was caused by improper extension of the telescoping boom, aggravated by an improper "boom up" signal given to the crane operator. During his investigation, Breyer observed that the crane controls for the telescoping boom were locked in the "extend" position, and indicated in his report that it was quite possible that the operator extended rather than retracted the boom when the crane began overbalancing. He also stated that improper use of the crane's outriggers may have been another cause, although this factor was not able to be demonstrated. In his report, Breyer concluded that "[t]he accident and resultant fatality was caused by a combination of improper lifting/lowering methods, inaccurate positioning of crane boom controls and possible improper use of the crane's outriggers."

The terms governing the purchase and sale of the Complex 19 launch facility equipment are found in the IFB, the contract, and the provisions of the DLA Sale by Reference pamphlet incorporated by the IFB. Under Article BA(A) of the IFB, Cuyahoga agreed "to furnish all labor, material and equipment necessary to disman-

tle and remove property at no cost to the Government." Section 7 of the General Sale Terms and Conditions, incorporated by the IFB, provides that title to the property vests in the purchaser as and when removal is effected, and William Randolph, the DLA property disposal specialist who wrote the Complex 19 IFB, indicated that a purchaser does not own property until it leaves government property. Section 9 of the General Information and Instructions, incorporated by the IFB from the Sale by Reference, provides generally that "[p]urchasers are responsible for making all necessary arrangements for the removal of their property," and Article BA(D) of the IFB specifies the manner in which purchased items should be dismantled and removed. However, Article BA(D) pertains to which items should be removed rather than the method of safely removing items. Under the contract, the United States had no responsibility to specify, monitor or inspect the placement or use of cranes. Article AQ, incorporated from the Sale by Reference, provides that "[a]ll work will be performed in a good and workmanlike manner and subject to such inspection by the Government as it deems necessary to insure strict compliance with the terms of the contract." Article BA(H) of the IFB warns that preparation and handling of the property may be hazardous and that "[p]urchasers must ascertain all facts as to the potential dangers and enforce all applicable fire and safety regulations during the performance of the contract." Article BA(I) directs that the "[p]urchaser must devise his own means of removing property from upstairs locations, providing such means are consistent with established safety practices and reasonably safe methods are employed." The contract does not provide for or incorporate safety regulations from manuals such as the Air Force Ground Accident Prevention Handbook (Handbook), and safety specialist Breyer indicated that the Handbook does not establish any standards that would apply to a contractor unless incorporated in the contract. Moreover, Breyer indicated that there was not any

other manual that could apply besides the Handbook, and that the only applicable general safety standards were OSHA regulations, which he lacked the authority to enforce. Thus, although Section 2 of the Sale by Reference General Information and Instructions requires that bidders conform to all fire, safety and security regulations prescribed by the military installation when on the installation, under the Cuyahoga contract there were no such applicable safety requirements other than OSHA regulations.

On September 9, 1977, a prework conference was held on Contract No. 31–7410–003 in order to insure that the successful bidder on the contract understood what was and was not to be removed, as well as the terms and conditions of the contract. William Turner, the chief DLA property disposal officer at Patrick AFB, discussed the contract timetable, working hours, facilities, security matters, and potential delays due to inclement weather and launches. A.T. Wansley, a Pan Am security inspector, explained Cape Canaveral security and traffic rules. Breyer, the safety officer assisting DPDS on this contract, briefed the Cuyahoga personnel on safety, indicating that cranes should have trained operators, and that equipment should be in good working condition and would be inspected.

In his deposition, Breyer testified that he visited Complex 19 possibly twice, and that on neither occasion were there cranes on site. In addition, he indicated that he was not notified when the cranes were brought on site. Breyer explained his statement at the prework conference as follows:

> Yeah, I made that statement. It meant that if any of their equipment were brought in, any equipment which was used, that it should be in good working condition. And it would be inspected, was that if and when I was out there ... and I saw some equipment ... then I would take the opportunity that it was in what I would consider safe working order.

(Breyer Oct. 14, 1982, Dep., pp. 10–11).

According to Breyer, he had limited authority at the Complex 19 site because he was acting in an advisory capacity to DPDS. Fred Boyd, another Air Force safety specialist, also attended the Cuyahoga prework conference. Boyd, who essentially was a trainee in September, 1977, attended the meeting because the Cuyahoga contract was peculiar in that the contractor was solely responsible for safety, and he wanted to see how to handle such a situation. In Boyd's view, the point of the safety discussions at the prework conference was to protect government property.

In order to insure compliance with the contract terms, DPDS personnel periodically monitored the Complex 19 worksite. Randolph testified that he and/or Turner were at the site virtually every day to check on work progress, and to make sure that Cuyahoga workers were removing only those items purchased by Cuyahoga and were leaving the remaining items in the manner prescribed by the IFB. According to Randolph, who drafted the IFB, Cuyahoga was in charge of safety on the job. He stated that although Cuyahoga personnel initially were briefed on general requirements of base safety, "[T]hey're the experts on doing this [removal]. Now, we can tell them, okay, you have to do this, you have to do that, but determining how it's done is up to them. They are experts. That's why they were given the contract." (Randolph Oct. 14, 1982, Dep., pp. 14–15).

Randolph testified that government safety officers at the base lacked the authority to stop the job if they thought the work was not being performed safely, except for illegal or gross violations of base policy such as starting a fire. Randolph and Turner both indicated that if they saw obvious or flagrant safety violations while monitoring compliance with the contract terms, they would bring it to the attention of Cuyahoga personnel, but neither believed they could enforce safety standards. Breyer also indicated that he had no authority to enforce safety violations, and could only advise DPDS personnel that the violations were occurring. Randolph concurred, indicating that for safety and working condi-

tions, "if Cuyahoga insisted and said, " 'We're the experts,' ... they were the experts ... [if] they said 'This is the way we work and you have nothing to say about this,' ... we couldn't stop them." (Randolph Dep., p. 18).

## CONCLUSIONS OF LAW

The court has jurisdiction over this wrongful death action under the FTCA, 28 U.S.C. § 1346(b). Under the FTCA, the United States is liable to the same extent and in the same manner as a private individual. *Id.; Alexander v. United States*, 605 F.2d 828 (5th Cir.1979). The law of the place where the alleged negligent acts or omissions occurred must be applied. 28 U.S.C. § 2674; *Daniels v. United States*, 704 F.2d 587, 591 (11th Cir.1983); *Gassman v. United States*, 589 F.Supp. 1534, 1544 (M.D.Fla.1984), *aff'd*, 768 F.2d 1263 (11th Cir.1985). From the allegations in the complaint and the arguments in plaintiffs' memorandum in opposition to summary judgment, the court ascertains the four possible theories of liability discussed separately below.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Recently, the Supreme Court clarified the " 'genuine issue' summary judgment standard" of Federal Rule of Civil Procedure 56(c), (e). *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *see Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, — U.S. —, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "By its very terms, [Rule 56(c)] provides that the mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Anderson*, 106 S.Ct. at 2510 (emphasis in original).

Summary judgment analysis centers on the definitions of the adjectives "genuine" and "material." A "genuine" issue of fact is shown where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Williams v. Georgia Department of Human Resources*, 789 F.2d 881, 883 (11th Cir.1986) (per curiam) (acknowledging the "genuine issue for trial" consideration). "[M]erely colorable" or "not significantly probative" evidence is insufficient to prevent summary judgment. *Anderson*, 106 S.Ct. at 2511. Once the moving party has made and supported a motion as required under Rule 56(c), "[t]he non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*, 801 F.2d 1286, 1291 (11th Cir.1986) (citing *Matsushita* ). "Material" refers to "the substantive law's identification of which facts are critical and which facts are irrelevant that governs" or "a criterion for categorizing factual disputes in their relation to the legal elements of the claim...." *Anderson*, 106 S.Ct. at 2510.

Comparable to directed verdict analysis, a summary judgment motion "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 2512. The trial judge's inquiry is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. ... Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant. ..." *Id.* at 2512–13. Therefore, at the summary judgment stage, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 2514. On the facts presented in this case and the

applicable law, the court concludes that there are no genuine issues of material fact.

(1) *Liability of the United States for Negligence by Cuyahoga or its Employees*

■ The first potential theory of liability raises the issue of whether the United States can be liable for the negligence of Cuyahoga or its employees. Under § 1346(b), the United States waives sovereign immunity for personal injury or death caused by "the negligent or wrongful act or omission of any employee of the Government.." 28 U.S.C. § 1346(b). According to § 2671, the term "employee of the Government" includes officers or employees of any federal agency. " 'Federal agency' includes the executive department, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States.*" 28 U.S.C. § 2671 (emphasis added). Federal law governs the determination of whether an individual or entity is a government employee or agency or an independent contractor. *See, e.g., Logue v. United States,* 412 U.S. 521, 528, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973); *Cavazos v. United States,* 776 F.2d 1263, 1264 (5th Cir.1985). The distinction between those who are federal agencies and employees and those who are not is critical because the United States is not liable for the negligence of lessees or independent contractors with the government or their employees. *See, e.g., Gober v. United States,* 778 F.2d 1552, 1554 (11th Cir.1986); *Lathers v. Penguin Industries, Inc.,* 687 F.2d 69, 72 (5th Cir.1982); *Alexander,* 605 F.2d at 833; *Aretz v. United States,* 604 F.2d 417, 427 (5th Cir.1979), *reh'g granted,* 616 F.2d 254 (5th Cir.1980) (en banc), *op. reinstated,* 660 F.2d 531 (5th Cir.1981).

■ A party under contract with the United States becomes an agency of the government within the meaning of the FTCA only if the government supervises the day-to-day operations of the contractor, including control of the detailed, physical performance of the contractor. *See, e.g., United States v. Orleans,* 425 U.S. 807, 814–15, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976); *Logue,* 412 U.S. at 528, 93 S.Ct. at 2219; *Alexander,* 605 F.2d at 833; *Cavazos,* 776 F.2d at 1264; *Flynn v. United States,* 631 F.2d 678, 680–81 (10th Cir. 1980). Contract terms requiring performance satisfactory to the government and providing for monitoring of compliance with the contract and with government safety regulations, and the implementation of such provisions, do not constitute the requisite day-to-day supervision necessary to convert a contractor into an agency or employee of the government. *See, e.g., Orleans,* 425 U.S. at 815, 96 S.Ct. at 1976; *Penguin Industries,* 687 F.2d at 73; *Alexander,* 605 F.2d at 834; *Flynn,* 631 F.2d at 680–81. Indeed, even the full-time presence of government employees at a worksite to monitor compliance with contract specifications and safety standards does not demonstrate sufficient government control to make a contractor an employee under the FTCA. *Lipka v. United States,* 369 F.2d 288 (2d Cir.1966), *cert. denied,* 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967). In view of these principles, the monitoring of contract compliance by Turner and Randolph, of fire hazards by Page, and, occasionally, of safety by Breyer falls far short of the daily supervision and control of work which results in government agency status. Thus, Cuyahoga was not an agency or employee of the United States.

Section 2671 excepts "any contractor" from the definition of "federal agency" or "employee of the government". Therefore, even if Cuyahoga is not an independent contractor, employees of businesses which merely enter into a contract with the United States also are not federal employees for FTCA purposes. *See generally LeSeur v. United States,* 617 F.2d 1197 (5th Cir. 1980). Thus, under ordinary circumstances, the United States cannot be held liable for negligence attributable to Cuyahoga or its employees.

■ Assuming, *arguendo*, that operation of a crane is an inherently dangerous activity under Florida law, *see, e.g., Grove Manufacturing Co. v. Storey*, 489 So.2d 780, 782 (Fla. 5th DCA 1986); *Atlantic Coast Development Corp. v. Napoleon Steel Contractors, Inc.*, 385 So.2d 676, 679 (Fla. 3d DCA 1980), the United States nevertheless is not liable for the negligence of Cuyahoga or its employees. First, under FTCA the government cannot be held vicariously or strictly liable for inherently dangerous activities. *See, e.g., Laird v. Nelm*, 406 U.S. 797, 799, 803, 92 S.Ct. 1899, 1900, 1902, 32 L.Ed.2d 499 (1972); *Penguin Industries*, 687 F.2d at 72; *Aretz*, 604 F.2d at 427. Second, regardless of the limitations on the government's waiver of sovereign immunity in the FTCA, the United States is not liable under Florida law on the basis of a nondelegable duty as the employer of a contractor for the performance of inherently dangerous activities.

Under Florida law, an owner/contractee has a nondelegable duty in contracting for the performance of inherently dangerous activities, and a contractor hired to perform inherently dangerous work is considered an agent or servant for whose acts his employer is vicariously responsible. *See, e.g., Florida Power & Light Co. v. Price*, 170 So.2d 293, 295 (Fla.1964). However, the owner/contractee is not liable for injuries to employees of an independent contractor for negligence caused by a fellow employee of the contractor unless the owner/contractee contributed or concurred in the act of negligence. *See, e.g., Id.* at 297–98; *Pearson v. Harris*, 449 So.2d 339, 343–44 (Fla. 1st DCA 1984); *Scofi v. McKeon Construction Co.*, 666 F.2d 170, 172 (5th Cir.1982) (applying Florida law); *Johnston v. United States*, 461 F.Supp. 991, 994 (N.D.Fla.1978), *aff'd*, 603 F.2d 858 (5th Cir.1979). In contrast to their vicarious liability to third-party members of the public, under *Price* and subsequent cases, owners/contractees are not liable to employees of independent contractors "[u]nless and until it is shown the contracting owner by positive act of negligence or negligent omission on his part causes injury to the independent contractor

or to the latter's employees ..." *Price*, 170 So.2d at 298; *see Scofi*, 666 F.2d at 172. The government had no affirmative duty to take special precautions or to see that such precautions were taken. *Scofi*, 666 F.2d at 173; *Johnston*, 461 F.Supp. at 994.

The *Price* exception to the inherently dangerous activity doctrine does not apply where the owner is the general contractor or otherwise actively engages in or supervises the work. *Pearson*, 449 So.2d at 344; *Padilla v. Gulf Power Co.*, 401 So.2d 1375 (Fla. 1st DCA 1981). However, the facts in this case do not show such active involvement by the government in Cuyahoga's work. *See infra* at pp. 1328–29.

Moreover, plaintiffs' argument that the general rule and not the *Price* exception applies in this case is without merit. Plaintiffs contend that Cuyahoga employees enjoyed the greater protection afforded third-party members of the public under the inherently dangerous activity doctrine. This argument is based upon defendant's position that the relationship between Cuyahoga and the government did not rise even to the level of intimacy of an independent contractor. The *Price* exception for employees of independent contractors is premised upon the independent contractor's control of and responsibility for the worksite. Plaintiffs contend that since, according to defendant, Cuyahoga was not an independent contractor, the more expansive protection accorded third-party members of the public applies to Cuyahoga employees. Regardless, however, of Cuyahoga's technical status as an independent contractor, the policies supporting the *Price* exception apply equally well in this case. Despite plaintiffs' assertions to the contrary, with respect to the removal contract Cuyahoga had control of and responsibility for the worksite comparable to that of an independent contractor. In fact, it appears to have had even greater control than independent contractors over the method of performance of the contract and the consequent safety considerations. The situation of Cuyahoga employees is more comparable to

employees of independent contractors than to members of the general public. Therefore, the *Price* exception to the inherently dangerous activities doctrine applies to employees of Cuyahoga.

In summary, under the FTCA the United States may be held liable only for the negligence of its own employees, and not for the negligence of those who contract with the government or their employees. Cuyahoga merely contracted with the government, and was not an agency or employee of the United States. In addition, even if operation of a crane is an inherently dangerous activity under Florida law, the government cannot be held vicariously liable for the negligence of Cuyahoga or its employees. Finally, under the circumstances of this case, the United States did not have a nondelegable duty to employees of Cuyahoga in connection with the performance of an inherently dangerous activity. Thus, the United States is not liable for the negligence of Cuyahoga or its employees.

### (2) *Contractual Duty of the United States to Assure Safety*

■ A second possible theory of liability is that the United States was obligated under the contract to assure safety at the Complex 19 worksite. The gravamen of plaintiff's argument appears to be that: (1) under the contract the government retained control over Cuyahoga's work, including safety considerations; (2) the government was negligent in exercising its control over the safety practices of Cuyahoga, and this negligence was independent of fault attributable to Cuyahoga; and (3) the government's negligence or wrongful acts caused the death of Michael Schwab. In support of this interpretation of the contractual duties imposed upon the government, plaintiffs cite Sale by Reference Article AQ, IFB Article BA(D), and IFB Article BA(E).

■ The contract between Cuyahoga and the government does not incorporate any safety regulations, and requires only that applicable safety regulations, of which there were none, be observed. Safety reg-

ulations and manuals, such as the Handbook, which were not incorporated in the contract do not impose any duty upon the government to assure safety. *LeSeur*, 617 F.2d at 1199. Furthermore, even if the contract had included safety requirements, employees of contractors cannot recover from the government under the FTCA on the basis of contractual provisions requiring various safety measures or reserving the right to inspect, or the actual presence of government safety inspectors at the site unless the government's involvement in safety considerations has created, in effect, a joint endeavor or venture to assure safety. *Id.; Alexander*, 605 F.2d at 833; *Johnston*, 461 F.Supp. at 993; *see, e.g., Lowe v. United States*, 611 F.2d 76, 77 (5th Cir. 1980); *Flynn*, 631 F.2d at 681; *Gowdy v. United States*, 412 F.2d 525, 529 (6th Cir.) *cert. denied*, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969). In addition, the government was not obligated to instruct Cuyahoga employees in the use of the crane or to inspect the crane. *Gowdy*, 412 F.2d at 529. Because the contract did not include any safety requirements, it is clear that the government was not involved by contract in a joint endeavor to assure safety. Thus, plaintiffs' argument that the government is liable because it failed to perform its contractual duty to supervise the work and safety practices fails in view of the fact that it had no such contractual duty.

### (3) *Actual Assumption of Safety Responsibilities by Employees of the United States*

■ The third potential basis for liability is the actual assumption of safety responsibilities by employees of the United States. In support of this theory, plaintiff relies on the version of the Good Samaritan doctrine embodied in the Restatement (2d) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liabil-

ity to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A (1965).

Initially, the court is troubled by the seeming inconsistency of imposing liability upon the United States based upon safety inspections it voluntarily undertook without a contractual right to perform them when liability could not be imposed based upon safety inspections it had a contractual right to perform. *See supra* at p. 1326. As with contractual safety provisions, it would seem appropriate to impose liability upon the United States for negligent performance of gratuitous or voluntary safety supervision only when the government's voluntary undertaking to insure safety amounts to a joint endeavor with the contractor to assure safety. The government's involvement in safety supervision in this case falls far short of the extensive involvement necessary to create such a joint endeavor to assure safety. However, because the government would not have a duty under § 324A, the court need not base its decision upon this reasoning.

■■■ Three Florida district courts of appeals have applied § 324A in holding that a duty of care may be owed when a retirement home undertakes the care and supervision of a resident, when a babysitter assumes the care and supervision of a child, and when a bus lines operates a tour as well as provides transportation. *Garrison Retirement Home Corp. v. Hancock*, 484 So.2d 1257 (Fla. 4th DCA 1985); *Barfield v. Langley*, 432 So.2d 748 (Fla. 2d DCA 1983); *Kaufman v. A–1 Bus Lines, Inc.*, 416 So.2d 863 (Fla. 3d DCA 1982). In accordance with § 324A, the United States may be held liable under a theory of negligent breach of a duty gratuitously or voluntarily assumed if a claim exists under the applicable state law for the injuries alleged. *See, e.g., LaFond v. United States*, 781 F.2d 153 (8th Cir.1986); *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1159 (D.C.Cir.1985); *see generally Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955); *Loritts v. United States*, 489 F.Supp. 1030 (D.Mass.1980).

In *Johnston*, 461 F.Supp. at 993–994, the plaintiff argued that the government had negligently breached a voluntarily assumed duty to assure safety when government inspectors failed to require guardrails which might have prevented injury. In analyzing § 324A, the court indicated that it must first determine whether or not the government had undertaken, voluntarily or gratuitously, to render safety services to the contractor. *Id.; Roberson v. United States*, 382 F.2d 714 (9th Cir.1967). In *Johnston*, the court held that the government did not undertake to render safety services to the contractor or his employees by its inspector's mere approval of, or acquiescence in, the design and use of the equipment. *Id.* Similarly, in *Beason v. United States*, 396 F.2d 2 (5th Cir.1968), the Fifth Circuit indicated that a government safety inspection program in connection with work being performed by an independent contractor was insufficient to impose liability under the Good Samaritan doctrine.

In this case, Breyer, the safety specialist, stated at the prework conference that equipment would be inspected, and he subsequently inspected the Complex 19 site on one or two occasions. He never inspected the cranes because they were not on site when he visited, and he was not contacted when they were brought on site. Breyer's statement and subsequent inspections represent no greater an undertaking to assure safety than the safety inspection program in *Beason*. Furthermore, any acquiescence by Page, Turner, Randolph and Breyer in Cuyahoga's placement and use of the crane was no greater involvement, and probably

far less, than the safety inspector's approval of the scaffold design in *Johnston.* Therefore, the court concludes that the government did not undertake to render safety services to Cuyahoga or its employees.

Plaintiffs argue that by its almost daily monitoring of contract compliance and work progress, the government assumed the duty to keep the premises safe for the workmen and subjected itself to liability for injuries at the worksite, citing *Napoleon Steel,* 385 So.2d at 679. In *Napoleon Steel,* the court indicated that an owner/general contractor who actively supervised daily construction activities had a duty to keep its premises safe for all workmen on the job and ultimately would be held liable for injuries occurring on its worksite. *See Conklin v. Cohen,* 287 So.2d 56 (Fla.1973). The facts in this case show that Breyer only visited the site once or twice prior to the accident, and that Turner or Randolph visited the site almost daily to check on contract compliance and work progress. However, it is clear from their deposition testimony that Turner and Randolph viewed their function and authority with respect to these visits as limited to insuring that Cuyahoga was complying with its obligations under the contract and that work was progressing in a timely fashion. They did not direct Cuyahoga or its employees on how to perform the work except to the extent necessary to insure contract compliance and to prevent damage to the remaining property. Page was at the Complex 19 site almost continually, but his sole function was as a fireman. His presence was intended to benefit the government by protecting its property, Cape Canaveral, from fire. These facts are insufficient to satisfy the standard of active supervision of daily work activities or operations necessary to impose liability under *Napoleon Steel.*

Moreover, if liability were imposed under this theory on these facts, Cuyahoga would be, in essence, an agency or employee of the United States even though it does not fall within the parameters of that term under federal law. In effect, the government would be forced to either assume liability for all injuries at a work site or to virtually abandon contract compliance supervision and fire safety to avoid liability. Such a result contravenes public policy, as well as Florida law and the limited waiver of sovereign immunity under the FTCA.

### (4) *Duty of the United States as Premises Owner*

A fourth possible theory under which to impose liability on the United States is for negligent breach of its duty as owner of the premises. In connection with this theory, plaintiffs contend that the United States owed the decedent the duty of care owed by a premises owner to an invitee, and that because the cause of the accident is unknown, the court cannot find that the government has not breached its duty of care. The government's duty as a premises owner to Cuyahoga's employees is that owed by a premises owner to invitees. *LeSeur,* 617 F.2d at 1200; *Palaidis v. United States,* 564 F.Supp. 1397, 1401 (M.D.Fla.1983). As landowner, the United States "had a duty to invitees, ... to 'use ordinary care to maintain the premises in a reasonably safe condition for use in a manner consistent with the invitation and to warn of *latent* perils which are known or should be known to the owner but which are not known to the invitee or which, by the exercise of due care, could not be known to him.'" *Palaidis,* 564 F.Supp. at 1401 (quoting *Rice v. Florida Power & Light,* 363 So.2d 834, 839 (Fla. 3d DCA 1978), *cert. denied,* 373 So.2d 460 (Fla.1979) (emphasis in original)); *see Ashcroft v. Calder Race Course, Inc.,* 492 So.2d 1309, 1311–12 (Fla.1986); *Spaulding v. City of Melbourne,* 473 So.2d 226, 227 (Fla. 5th DCA 1985); *Anderson v. Walthal,* 468 So.2d 291, 294 (Fla. 1st DCA 1985); *Pedreira v. Silva,* 468 So.2d 1073, 1074 (Fla. 3d DCA 1985).

It is at this juncture that the court's analysis of the premises liability theory departs from plaintiffs' position. Plaintiffs argue that summary judgment is inappropriate because there are fact questions as

to why the accident happened. Of course, these fact questions are relevant only if one possible cause of the accident involves a peril on the premises. Plaintiffs have not specified the perils which they believe were connected with the premises, and, consequently, have produced no evidence to support this theory of liability. The only evidence as to the cause of the accident is Page's eyewitness description of the accident and Breyer's assessment of its causes. This evidence supports the government's position that the accident likely was caused by improper operation of the crane, or perhaps by erroneous signals by a fellow employee or a defective crane. Plaintiffs have failed to respond to this evidence by producing evidence in support of a theory of causation which would lead to liability by the United States. Thus, plaintiffs have failed to meet the burden imposed by Rule 56(e), and summary judgment for the United States is appropriate.

Furthermore, it appears that even if the premises were connected with the accident, the United States would not be liable. The only possible premises-connected dangers of which the court can conceive are the arrangement of the platform and pit and the stresses placed upon the crane when lifting loads out of the pit. Both of these dangers were open and obvious, and, thus, "the government as owner of [the premises] could not have anticipated that a reasonably careful workman would not protect himself from the known and obvious danger here involved." *LeSeur*, 617 F.2d at 1200 (quoting *Gowdy*, 412 F.2d at 535). The United States had no legal duty to warn the decedent of these open and obvious dangers. *Id.; Palaidis*, 564 F.Supp. at 1401. In connection with the stresses placed on the crane by the load, it is notable that the decedent was, as plaintiffs contend, an experienced crane operator. Thus, even if the stress on the crane was a latent peril, it was one which decedent either knew or should have known in the exercise of due care. *See generally, Storr v. Proctor*, 490 So.2d 135 (Fla. 3d DCA 1986). In addition, the contract warns that handling of the property may be hazardous and that the purchaser must obtain all facts as to the potential dangers.

Finally, as a general rule, "there is no common law duty on the part of an owner to provide a safe place to work for employees of contractors engaged in the performance of work on the owner's premises." *Pearson*, 449 So.2d at 343; *Goodman v. Kendall Gate-Invesco, Inc.*, 395 So.2d 240 (Fla. 3d DCA 1981). The exception to this maxim is where an owner or general contractor actively supervises daily operations. *Napoleon Steel*, 385 So.2d at 679. However, as discussed in section three, the government's involvement in this project did not rise to the requisite level to impose liability under this theory. Thus, there is no basis to impose liability upon the United States as a consequence of its status as a landowner.

In conclusion, the court has surveyed the possible theories of liability and has determined that the United States is not liable on the facts produced on summary judgment. Applying the recently explicated definition of a genuine issue of material fact, there is not sufficient evidence such that reasonable jurors could find by a preponderance of the evidence that plaintiffs are entitled to a verdict under any of the four theories of liability.

Accordingly, the court granted defendant's motion for summary judgment. Because the third party claims may be rendered moot by the decision for the United States, the court concludes that there is no just reason for delay of the entry of judgment on the complaint against the United States. The clerk shall enter judgment for the United States, Rule 56(b), and shall administratively close the file on the third-party complaint.